Flanegan *vs.* The State.

FLANEGAN *vs.* THE STATE OF GEORGIA.

[WARNER, Chief Justice, being engaged in presiding over the senate organized as a court of impeachment, did not sit in this case.]

1. Where a homicide was committed in the dark and in the midst of a
crowd, and there is question whether a wound in the back from
which the death may have resulted, was made by the prisoner or
by another, a declaration made by a bystander immediately after the
rencounter, to the effect that he, the bystander, cut the accused in
the back with a knife, when the accused had no such cut in the
back, but deceased had, is admissible for all purposes as part of the
*res gestæ*, and a charge of the court confining such evidence to the
single object of impeaching the testimony of the bystander, is error
for which a new trial should be granted, though in other respects
no errors were committed, and the case otherwise was fairly tried,
the fight occurring in a crowd at night, and the evidence being con-
flicting.

2. Newly discovered testimony tending to impeach a witness, and in the main cumulative, will not be sufficient ground, of itself, for the grant of a new trial.

3. That a juror while charged with the case, had one or two casual communications with persons not on the jury, and that the bailiff in charge procured newspapers for him late in the evening and shortly before the verdict was found, will not necessitate a new trial, it appearing that nothing was said or done which had any bearing on the case, or which damaged the defendant. (R.)

4. Taking the entire case together, we find no other error except that stated in the first head-note. (R.)

Criminal law. Charge of Court. Evidence. *Res gestæ.* New trial. Jurors. Before Judge CRAWFORD. Marion Superior Court. April Term, 1879.

The following, in connection with the opinion, sufficiently reports this case :

Flanegan, as principal in the first degree, and two others, as principals in the second degree, were indicted for the murder of one Tullis. The evidence on the trial of Flanegan was, in brief, as follows : At a party which took place at the house of a Mr. Gordon, Tullis wanted a fiddle which Flanegan had, and refused to give up ; after playing awhile, he went out to the front of the house, and in a short time one Pickett came in and reported to Tullis that Flanegan was out there abusing him. Tullis went out, and a colloquy ensued in which Pickett joined with Tullis, and rendered himself efficient in bringing on a difficulty. Finally Tullis invited Flanegan to go out in the yard and fight; the latter seems to have been loth to do so, but at length they did go, and a fight ensued. Several others besides the principal actors took a hand in the affair. Such as were made witnesses testified that they were separating the parties, and acting as peace-makers, while other witnesses insisted that most of them acted in a manner too energetic to comport with peaceful intentions. Tullis was cut with a knife ; Flanegan was not hurt ; Tullis died from his wounds. The evidence for the state pointed to Flanegan s the one who did the cutting. One of his lines of defense

was that it was dark, and in the *melèe* the cutting was done by some other than himself. When Gunnels, a witness for the state who testified to having sought to separate the combatants, was asked if at the time, or within a moment or two thereafter, he had not said "Where's the God damned rascal? Let's kill him!" and if Pickett had not replied "He's gone, but I gave him five gashes in the back before he got away," the witness denied any such conversation. Other testimony was introduced to show that it did take place. In his charge, the court limited the effect of this testimony to the purpose of impeaching Gunnels. In regard to the details of what was said by the parties, etc., the evidence was very conflicting.

The jury found the defendant guilty of voluntary manslaughter. He moved for a new trial on the following, among other grounds:

(1.) Because the court erred in limiting the scope of the testimony, as set out above.

(2.) Because of newly discovered evidence. [On examination of the affidavits in support of this ground, it appeared that the new evidence was merely cumulative of that already introduced.]

(3.) Because one of the jurors communicated with various people after being charged with the case; and because the bailiff in charge of the jury left his post and carried messages for the juror. [The affidavits for the state show that the juror spoke to a lady at the hotel where the jury were domiciled, and asked her for a pack of cards called "authors;" that he received the cards and also a cigar; that the bailiff, at the request of the juror, sent for some newspapers and afterwards went himself for them. But these affidavits show that nothing was said by the juror to any one in regard to the case under consideration; that the jury were kept under lock and key; that, under the direction of the court for the bailiff to allow the jury to have papers, etc., to read during the night, he had endeavored

to get the newspapers which the juror wanted, and did obtain and deliver them late in the evening just before the verdict was found; that nothing was said or done to influence the juror in his decision.]

The motion was overruled, and defendant excepted.

W. S. WALLACE; BLANDFORD & GARRARD; E. M. BUTT, for plaintiff in error.

H. BUSSEY, solicitor-general, by JOHN PEABODY, for the state.

JACKSON, Justice.

The defendant was indicted for murder and found guilty of voluntary manslaughter; a new trial was denied him, and he excepted.

1. After a very mature consideration of this case, we have concluded to grant a new trial on the ground that the court erred in one material point in the charge to the jury. It appears from the record that Gunnels, a witness for the state, in answer to cross-questions, said that he did not say just after he pulled the accused from the deceased or jerked his hand back from striking him, or within a moment or two thereafter, " where's the God damned rascal, let's kill him," and that Munroe Pickett did not reply " he's gone, but I gave him five gashes in the back before he got away," or words to that effect. It afterwards appeared by other testimony that conversation to that effect immediately at the close of the fight did take place between the two. Upon this state of facts the court instructed the jury in the charge as follows: " But the defendant further insists in that connection, that if there was a knife used on that occasion it was not used by the defendant, and if the killing took place, it took place by reason of the fact that one Pickett was the guilty party and not the accused, and insists upon the testimony which has been submitted to you on that subject as being sufficient to satisfy your minds that

Pickett was the party who committed the offense. In that connection the court says to you did Gunnels ask ' where's the damned rascal,' referring to the prisoner at the bar, following it up with the words ' let's kill him ?' If so what Pickett said, if he said anything in reply to that remark of Gunnels, was not evidence to establish the fact that he did give Tullis a number of gashes in the back, but may be considered as evidence of what transpired between Gunnels and himself to see whether Gunnels did or did not swear truly."

In view of the facts disclosed in the record, we think that this charge was erroneous. The deceased had severe wounds in the back, one physician testifying that they killed him or largely contributed to his death; the accused had no such wounds in the back; the two men were fighting in the dark, and Pickett, if he cut one of them in the back with a knife, making several bad gashes, in all human probability cut the deceased, and if deceased died from these wounds, or would not have died but for these wounds in the back, Pickett may have killed him, though intending the licks or stabs for the accused. The conversation occurred just as Flanegan got away, and while deceased was bleeding with the wounds of which he died. Pickett was not making evidence for Flanegan, if he made the remark. It was part of the *res gestœ.* It was almost instantaneous with the stabbing which the witness swore he said he gave; therefore being *res gestœ,* it became an act done during the fight or evidence thereof, if he said it, and was testimony not only to impeach Gunnels, but to show that he did the stabbing in the back of deceased by mistake. It is clear therefore to us that the court was wrong to exclude it from the jury except to be used as impeaching the other witness. The jury had the right to consider it for all purposes, to be weighed by them with the other evidence. *O'Shields vs. The State,* 55 *Ga.,* 696; *Mitchum vs. The State,* 11 *Ga.,* 615; 1 Greenleaf Ev., 10 Ed., §§108–114.

2. The newly discovered evidence appears to be cumula-

tive and tending only to impeach the witnesses for state. Therefore alone, it could not operate to require a new trial. 25 *Ga.*, 182 ; 37 *Ga.*, 48; 39 *Ga.*, 718 ; 56 *Ga.*, 364 ; 59 *Ga.*, 391. But the case will be tried over, and then, of course, it can be used.

3. The trouble about the juror was answered by the explanations. So about the bailiff. Prisoner was not hurt. 18 *Ga.*, 534; 19 *Ga.*, 102.

4. The part of the charge first excepted to gave the law substantially to the jury in regard to justifiable homicide, and taking the case altogether, we are unable to see any error except the exclusion from the jury of the evidence of Pickett's sayings to show that he did what in the *melée* he said he did, as testified to by some witnesses. This evidence was good to be considered by the jury and weighed as part of the transaction for whatever they thought it worth ; and on this ground, coupled with the conflict of evidence, the fact that Pickett helped bring on the fight, the darkness of the night, the reluctance, apparently, of accused to fight, and the general confusion, we think that the case should be tried again.

Judgment reversed.