## STYLES *v.* THE STATE.

Where a motion for new trial predicated upon the improper conduct of
certain of the jurors charged with the trial of the case recites that
"the jurors, after they had been impaneled and before all the evidence
had been submitted, read copies" of a certain "newspaper containing
a certain editorial," which was "calculated to mislead the jurors,
prejudice their verdict," etc., and there is no denial by the State, and
the recitals of the motion are certified by the judge to be true, the
motion and certificate will be construed to mean that the jurors actu-
ally read the editorial to which the objection related.

(*a*) The editorial complained of did not by name refer to the case on
trial, but its reference was to cases generally of that class, and was
of such character as to comprehend, among others, the case on trial.

(*b*) It is improper for jurors charged with the trial of a murder case
to read from a newspaper editorials which directly or indirectly tend
to influence their minds and to destroy their perfect freedom from bias
or prejudice, either for or against the accused.

(*c*) Where jurors, while impaneled to try such case, read from a news-
paper such an editorial, and, in the motion for new trial, it is affirm-
atively shown that neither the defendant nor his counsel consented
thereto, and that neither of them knew of the fact until after verdict,
it was erroneous for the court to refuse to grant a new trial.

Argued October 25,—Decided November 12, 1907.

Indictment for murder. Before Judge Parker. Ware superior
court. July 13, 1907.

The 4th ground of the motion for new trial complains that cer-
tain jurors, after they had been impaneled and before all the evi-
dence had been submitted, read copies of the Savannah Morning
News, a daily newspaper, containing a certain editorial which it is
alleged was calculated to mislead the jurors, prejudice their ver-
dict, and influence them in the performance of their duty; all of
which was prejudicial to the cause of the defendant. Appro-
priate affidavits by the defendant and his counsel were submitted,
to the effect that they did not know of the conduct of the jurors
until after the verdict. The trial judge approved this ground of
the motion and certified that the recitals of fact were true. The
editorial complained of was as follows: "The Opinion of a Solic-
itor-General. Commenting upon the outcome of the Lyle murder
trial at Waycross, Solicitor-General Bennett was quoted as say-
ing: 'I have given the matter a great deal of thought, and I
have come to the conclusion that human life is too cheap in this
country, due to the fact that juries are too lax in enforcing the

law.' Further along in his talk he said: 'There are entirely too many homicides in this and other counties. Take the Dominion of Canada, divided from this great country only by an imaginary line, and you will find that there are nearly 100 homicides in the United States to one in Canada. There is but one explanation. In Canada the law is enforced and in the United States it is not. The law says that the punishment of a person convicted of murder shall be death, and it does seem to me that if this law were enforced and the punishment meted out to persons where there is no doubt of their guilt, it would prove a great benefit, and deter others who are inclined to commit like crimes.' The foregoing is safe and sound doctrine. If it had the approval of juries generally there wouldn't be an account of a homicide in the newspapers of this State every day or two. Only last Saturday we commented upon the need of a stricter enforcement of the law against carrying concealed weapons, the occasion being reports of two homicides in the State on the previous day. Yesterday there was another homicide at Macon, the victim having just been indicted for the alleged cause of the crime. As to the truth or falsity of the charge that led to the shooting, we do not undertake to express an opinion, but we do know that the law should have been permitted to take its course. We can not have safety for life and property if men are permitted to take the law into their own hands when they feel they have a grievance. As a rule there are two sides to every case, and the safety and well-being of society requires that a jury shall decide which is the right side, and measure out punishment to the guilty. It is impossible to predict where this thing is going to stop if men are permitted to go about their daily duties carrying concealed weapons, which they use promptly on various degrees of provocation, because they believe that the danger of being punished is very remote. We do not comment on the Lyle trial, because it is probable that the accused will have to face a jury again within a very few days, but we are free to say that there are scores of persons in this State guilty of shedding human blood who would now be in the penitentiary or would have paid the penalty of their crimes on the scaffold if absolute justice had been meted out to them. And what is true as to this State is true as to about every other State. It is true, as Solicitor-General Bennett says, life is so cheap in this country that it is a

difficult matter to get a jury to find a verdict of guilty, even when the evidence of guilt is overwhelming. In Canada the law against murder is enforced vigorously and swiftly. The consequence is, the number of homicides is small in comparison with the number in this country. What is needed is a stirring of the consciences of the people. They must have impressed upon them the sacredness of human life. When they have a proper regard for it, juries will not be swayed by sentiment or seek excuses to avoid their duty."

*L. A. Wilson* and *Crawley & Crawley,* for plaintiff in error.

*John C. Hart, attorney-general, John W. Bennett, solicitor-general,* and *P. W. Meldrim,* contra.

ATKINSON, J. We will deal at once with the 4th ground of the motion for new trial. It is expressly stated in the motion for new trial that the jurors read the paper which contained the editorial complained of. The judge certified the recital of facts to be true. It is thus made affirmatively to appear that the jurors read the paper. It is nowhere stated in so many words that they read the editorial, but there is no explanation by the jurors nor any counter-showing. It was in the paper and, as we shall see, was of harmful character, and in the absence of a denial it will be presumed that the jurors read it. See, in this connnection, Thompson & Merriam on Juries, §395, and cit. The judge no doubt intended to certify that the jurors read the editorial. Had that not been the intention, he could simply have certified that the jurors did not read the editorial, and would thereby have avoided the question which counsel have argued and which we are called upon to decide. In the absence of denial, we will presume, from the recitals in the motion and the judge's certificate, that the editorial was in fact read by the jurors. This leads to the inquiry as to whether the fact of reading the article was misconduct upon the part of the jurors, and, if so, whether it was of such character as to require a reversal of the judgment refusing a new trial.

An examination of the editorial will show clearly that it is argumentative in favor of convictions in capital cases such as the one on trial. Either a casual or a most scrutinous reading of the article will lead to that conclusion, and to none other. It was not only argumentative, but almost of coercive character, in that it criticised juries for failure to convict. The charge inferen-

tially made was that the conditions in this country were such that jurors would not convict in murder cases "even where the evidence of guilt was overwhelming." It was stated that the remedy needed was a "stirring of the consciences of the people." What effect this appeal actually had upon the minds of the jurors it is impossible to say. That it was an irregularity follows from the fact that the article was read by the jurors after they had qualified, without the knowledge or consent of the court or of the defendant or his counsel. It was read after the jurors had been put upon their voir dire. Whether, after reading the article, the jurors would again have said that their minds were perfectly impartial between the State and the accused, or that there was no bias or prejudice resting upon their minds, either for or against the accused, we have no means of knowing. Those questions were not again put to the jurors. It is possible that the minds of the jurors may have been so influenced by the article as to render them unable to answer the statutory questions in such way as to leave them competent to try the accused. Again, treating the article as an address to the jurors, it would be improper for at least two reasons: first, because it was made by one not authorized to participate in the trial in an advisory or any other way; second, because it was made without the knowledge or consent of the defendant or his counsel, and there was no opportunity to reply. The possible harm to the defendant that could result from an editorial is incalculable. It was well said by Wood, J., in Cartwright *v.* State, 71 Miss. 82, 14 So. 526, that "this method of communicating to and impressing upon the jury, or any member of it, the opinion of others, is open to the same condemnation which would be visited upon oral expressions of opinion touching a defendant, injected into the body of the jury by some designing intermeddler. The widely-read and influential daily journal, speaking for, as well as to, the public, reflecting popular sentiment, as well as making it, must be held to be much more powerful in influencing the average man than any expression of opinion by a single, private individual."

It is insisted that the defendant could not have been injured, because the article did not make reference to the particular case on trial. The fact that the case is not specially named does not necessarily deprive the argument for convictions, as contained in

the editorial, of its injurious effect. The argument made no exceptions and was addressed to all prosecutions in murder cases, which in general terms embraced the case under consideration. The subject of the editorial was of the same class as the subject of the case on trial. The editorial was apparently from a disinterested source, and for that reason may have produced an effect even more harmful to the defendant than if the case had been specially named; for in the latter case the jury might at least have attributed to the writer the interest of a partisan. The whole tendency of the editorial was to play upon the passions and emotions of those who read it, and to encourage juries to convict in capital cases. An appeal of that character, whether made by a writer, an orator from the pulpit, or an actor upon the stage, may be made with such effect as to influence the mind while acting upon any particular matter, without direct reference thereto. When a juror enters upon the trial of a criminal case, the law contemplates his withdrawal from the public and makes no provision for addresses to him from outside sources, for his entertainment or otherwise, which are calculated, directly or indirectly, to excite any passions or emotions with respect to the matter upon which he is to sit in judgment. Perfect impartiality in the juror is the object of the law. Anything not legitimately arising out of the trial of the case, which tends to destroy the impartiality of the juror, should be discountenanced. Whether beneficial to the State or to the accused, such things, upon the ground of irrelevancy, should be suppressed and not given the opportunity of influencing the minds or exciting the passions of the jurors. Verdicts should be the result of calm deliberation, founded upon the law and evidence. The accomplishment of that object can never be assured where irrelevant things which tend to destroy the impartiality of the jurors are allowed to creep into the trial.

We know of only three cases which have been before this court where it was argued that a new trial should have been granted upon the ground that the jurors, after having been impaneled, had been permitted to read newspapers. *Fogarty* v. *State,* 80 *Ga.* 450; *Flanegan* v. *State,* 64 *Ga.* 52; *Hunter* v. *State,* 43 *Ga.* 483 (6). In the two cases first mentioned this court declined to interfere with the discretion of the trial court in refusing to grant a new trial, because it was not shown that any harm had resulted to the

defendant by the reading of the newspaper. In the *Fogarty* case the opinion recites that "the record discloses that the copies of the paper which the jurors were reading contained nothing about the case except the fact that the case was on trial." It was not made to appear in either of those `cases, other than as just stated with reference to *Fogarty's* case, what the paper contained, and therefore it was not affirmatively shown by the movant, upon whom the burden rested to show error, that anything appeared in the paper which it was improper for the jury to see. Those cases were different from the case under consideration in that respect, because in the present case it was affirmatively shown what the paper contained, and that the article in question was of such character as tended to render the jurors incompetent to serve in the case. In this way it is made affirmatively to appear that harm had been done to the defendant. In the last of the three cases cited *(Hunter* v. *State,* 43 *Ga.* 483), the article contained in the paper was one referring to the case by name as an important case, and severely criticising counsel for the accused because of certain language employed by counsel in his argument for a change of venue. The paper was read by the jurors in the presence of the court and of counsel for the accused, who, although seeing them reading the paper, made no objection until after the verdict. In dealing with that ground of the motion for new trial, the court, speaking through Chief Justice Lochrane, said: "In relation to a portion of the jury, before the completion of the panel, reading the 'Quitman Banner,' it appears that this newspaper contained no portion of the testimony, either for or against the prisoner, but contained a diatribe against one of the counsel of the accused for a speech made on a motion to change the venue. It is difficult to draw any line sufficiently well marked to constitute a rule upon this subject, and we can readily appreciate the propriety of keeping the jury, from the moment they are sworn in chief, away from all influences and communications which might, in the most remote degree, influence their verdict; but we are not prepared to say that the reading of a mere newspaper under the circumstances, being known to the counsel of the accused, not excepted to by him, then and there, and transpiring in open court, would constitute a ground of error sufficient to set aside a verdict. On the contrary, we hold that it would not." It will be observed that the court in that

case "appreciated the propriety of keeping the jury . . away from all influences and communications which might in the most remote degree influence their verdict," but placed the ruling re-fusing to order a new trial mainly upon the proposition that coun-sel did not move at the proper time. This was in accordance with the rule which is now better recognized, that when a party moves for a new trial on the ground of misconduct of a juror, he must aver and show affirmatively that both he and his counsel were ig-norant of the misconduct charged, until after the verdict. *Wynn* v. *City & Suburban Ry.*, 91 *Ga.* 344; *Cogswell* v. *State*, 49 *Ga.* 103; 12 Enc. Pl. & Pr. 553, 558. While *Hunter's* case, supra, did not comply with this rule, Styles, the defendant in the pres-ent case, did comply by making the affirmative showing.

There are other cases, in which new trials have been ordered upon the ground of misconduct upon the part of the ju-rors. These cases do not involve the question of the pro-priety of the jurors reading newspapers, but the rulings made in them go to the preservation of the purity of jury trials, and the principles announced in them are applicable to the facts in this case. We will deal with some of them. The case of *Shaw* v. *State*, 83 *Ga.* 92, is where the misconduct complained of consisted in the jury attending a prayer-meeting conducted by the prosecutor in the case. Upon arrival the jurors were shown their seats by the prosecutor, separate and apart from the remain-der of the congregation. The prosecutor led the services and ad-dressed the congregation. Prayers were offered for the court and its officers, but no reference was made to the particular case on trial. There was shouting at the meeting. In passing upon this case, the following was announced in the headnote: "Where mis-conduct of a juror or of the jury is shown, the presumption is that the defendant has been injured, and the onus is upon the State to remove such presumption by proper proof. While review-ing courts are loth to interfere with the decision of the trial judge that the presumption has been removed, such decision is in this State subject to review. The misconduct of the jury and of the officer in charge of them in this case was of such character as to require a new trial." In the course of the opinion it was said by Mr. Justice Simmons: "There are many things which can be done by individual members of the jury, or by the whole jury,

which are susceptible of such clear explanation that the trial judge would be authorized in refusing to set the verdict aside. There are other things, however, which if done by an individual member of the jury, or by the whole jury, are so contrary to the public policy of the State in the procurement of fair and impartial trials for the citizens of the State, as to require that a verdict rendered by such jury be set aside, whether the defendant has been injured thereby or not; and in our opinion, the case under consideration belongs to this class. The State is jealous of the rights and liberties of its people. When one of its citizens is accused of crime, it throws around him all the safeguards that are possible, in order to procure him a fair and impartial trial. It requires the officer who has charge of the particular jury to swear, in substance, in open court, to take them to the jury room and there keep them safely, and not to communicate with them himself or suffer any one else to communicate with them, unless by leave of the court. The law contemplates that when a jury are selected and sworn to try a citizen for felony, they shall be entirely separated from the world, and that no communication whatever shall be had with them from the beginning of the trial until the verdict is reached, unless by leave of the court. It contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way; that the minds of the jury shall be entirely occupied with the consideration of the case which they are sworn to try." The case of *Smith* v. *State,* 122 *Ga.* 154, presents another instance where the judgment of the lower court was reversed because it refused to grant a new trial upon the ground of misconduct upon the part of the jurors. It is unnecessary here to make further reference to the misconduct complained of. In this case it was said: "This court, from the time of its organization to the present time, has striven to protect the purity and impartiality of jury trials, and wherever there have been irregularities, unless fully explained and the court satisfied that the accused has not been injured, new trials have been granted. Where the misconduct of the officers and jury has been gross, this court and others have held that a new trial should be granted on account of public policy, whether the accused was injured or not." The case of

*Obear* v. *Gray,* 68 *Ga.* 182, presents another instance where a new trial was granted because the court refused to set aside a verdict because of improper conduct of the jurors. In this case, Mr. Justice Crawford, speaking for the court, said: "But other and quite as serious complaints are made in reference to allowing the jury to be carried to the public park, a place of great resort, especially on Sundays, and allowing them whilst there to pass about and to separate for some considerable time. Every jury is to be carried to the jury room, or some other private and convenient place, where they are not to be spoken to by the officer having them in charge or others, unless by leave of the court. To take them, therefore, to a park, which is said to be a place of great public resort, especially on the Sabbath day, where they are almost sure to hear something said about the case, whether they would or not, is most clearly a violation of the spirit and purpose of the law in withdrawing them from the body of their fellow citizens until they have agreed upon their verdict. We think that this was a good ground upon which to set aside the verdict, unless it was clearly shown that no such things occurred while they were in the presence and hearing of other visitors. It is true that the affidavits offered show everything necessary to purge them, except that it does not appear but that they heard bystanders make remarks about the case. To make the purgation complete, this should affirmatively appear. 37 *Ga.* 332; 38 Ib. 216; 56 Ib. 653." We do not deem it necessary to make further reference to any of the cases cited in the several cases to which we have alluded.

Under the view we take of the case the editorial complained of dealt with a subject so related to the case on trial as to make its references applicable to that case; and, because of its argumentative character and its tendency, through appeals to the emotions and passions of jurors, to displace the element of impartiality in the minds of the jurors, it was harmful to the accused, in that it tended to deprive him of a fair and impartial trial. He brought himself under the rule by making complaint in the manner and at the time authorized by law, and the judge should have granted a new trial. As the case must go back for another trial, we will not deal with the assignments of error which relate to the general grounds of the motion.

*Judgment reversed. All the Justices concur.*