## UNITED STATES v. MONTGOMERY et al.

District Court, S. D. New York.
July 15, 1930.

David P. Siegel, of New York City, for defendant Montgomery.

Maxwell Lopin, of New York City, for defendant Tiffany.

C. G. F. Wahle, of New York City, for defendants Bessie Strasbourg and Joseph J. Strasbourg.

Charles H. Tuttle, U. S. Atty., and Owen S. M. Tierney, Asst. U. S. Atty., both of New York City.

WOOLSEY, District Judge.

I grant the motion for a mistrial.

I. The trial of this case was suspended on Monday May 19, 1930, by reason of serious injuries suffered by the defendant Montgomery and his trial counsel, Mr. Siegel, in an automobile accident on Sunday May 18th.

During the suspension of the trial, on May 22d, the Evening World in a front page article with large headlines reading, "Swindler Vause Once Hired Chief Witness

Against Him," published a picture of the defendant Montgomery, described him as a swindler, a jailbird, a disbarred lawyer, and an ex-convict, and stated that he had been a fugitive from justice on one occasion, and gave other damaging details concerning his career.

The article was written, however, not in comment of the present trial, which was merely incidentally mentioned, but in connection with the indictment of one Vause, a county judge and others for alleged use of the mails to defraud through the agency of the Columbia Finance Corporation.

The article also stated that Vause had called in Montgomery, whilst he was on bail awaiting trial in the present case, to improve the condition of the Columbia Finance Corporation, and that Montgomery had testified before the grand jury in the investigation which led to the indictment of Vause and his associates.

This article in the Evening World of May 22d was the precursor of and inspired similar articles in several other afternoon papers on that day and in several morning papers the next day.

The defendant Tiffany was merely mentioned as being on trial in this case with Montgomery. Neither of the other defendants were referred to in any way.

My attention was first called to these articles on Friday afternoon, May 23d, by the defendant's attorneys, who, at about the same time, also brought them to the attention of the United States attorney.

A formal motion for a mistrial had to be postponed until Thursday May 29th, owing to the injuries suffered by Mr. Siegel in the accident above mentioned. Consequently there is not any question but that timely action was taken by the defendants. Indeed there had not been any proceedings in the trial other than adjournments, between the days when the articles above referred to were published and the 29th of May, when this formal motion for mistrial was made before me.

II. There are, I think, two questions to be determined in deciding an application for a mistrial based on the appearance in the public press of articles which it is claimed are prejudicial to the fair trial of a case.

The first is: What is the source of the objectionable matter contained in the articles and whether it is traceable to either of the parties?

The second is: Whether the articles have come to the attention of the jury, and, if so, whether their verdict is likely to be affected by reason of the information or statements contained therein?

█ 1. It is, of course, obvious that the moving party must establish that he is not the source of the information of which he complains and did not promote its publication. Otherwise a defendant might endeavor to block a trial which he felt was going against him, by creating a situation in which he could claim a mistrial on the ground of the publication of articles deleterious to him.

But here I find as a fact that neither the defendants nor their attorneys promoted the publication of the articles in any way or gave out the information on which they were based.

I also find as a fact that such part of the articles as are objectionable did not have their source in the office of the United States attorney.

From the evidence of some of the reporters called at the inquiry it appears that the objectionable parts of the articles came from the record rooms of the newspapers.

The articles, in so far as they are objectionable, may therefore be considered as being due to the tendency of the newspapers of the present day to print, without careful consideration of its implications, any bit of sensational information available.

The articles, although they were not aimed in any way at influencing this trial, had such a content as to make it highly inappropriate to have them brought to the attention of the jury in this case.

█ 2. This brings us to the second question here involved:

Will the orderly course of justice in this trial run the risk of being affected by any contraband information which may have reached the jury through the articles of which the defendants here complain?

Even in this publicity ridden age I did not think that this question of fact should be considered on the mere presumption that the articles had come to the attention of the jury.

In order to determine it, therefore, it was necessary to find out whether the members of the jury or any of them had seen, read, or discussed the objectionable articles, and, if they had done so, whether the court could satisfy itself that they would nevertheless be able to decide this case solely on the evidence adduced on this trial and be wholly unaffected by the information in those articles.

The jury was accordingly called in and interrogated by me. Five out of the twelve raised their hands when asked whether any of them had "seen or read" the articles in question. Eventually it appeared that only four had read the articles and that the other juryman who raised his hand when the first question was asked had merely seen Mr. Montgomery's picture in the Evening World but had not read the article about him.

Another juror said that one of the other jurors had asked him if he had seen the articles in the papers, and that he replied he had not, although he had seen Mr. Montgomery's picture.

I felt that the jurors who had read the articles should be asked further questions in order to find out as nearly as possible the effect of the articles on them, and thus secure from the jury an expression of the future attitude which its members were prepared to maintain towards the case, to guide my own decision on the motion.

I felt that, if any of the jurors confessed the slightest prejudice, a mistrial should certainly be granted. If, on the other hand, they stated that they could still decide the case on the evidence before them, it would be for me to determine whether I regarded it as safe to take them at their word.

Thereupon the jurors who had read or seen the articles were further interrogated. The result of this further examination of these jurors was not wholly satisfactory. Whilst three of those who had read the articles claimed they could still deal with the case on the evidence, the fourth seemed to me to answer rather uncertainly and inconclusively.

In addition to this impression as to this juryman, the fact, above mentioned, that one juror had asked another whether he had read the articles gave me an uneasy feeling that the objectionable statements would not long be unknown to the jurors who had not read them, and consequently that those statements might very well find a place alongside the evidence in the deliberations of the jury.

The question here involved is not whether, if I denied these motions and the case proceeded to a conviction of the defendants, it would be affirmed on appeal (cf. Marrin v. United States, 167 F. 951, 953 [C. C. A. 3]), but whether, after what has happened, I can feel satisfied that the defendants can have a trial uncontaminated by the information in the objectionable articles.

This motion, therefore, cannot, I think, be properly disposed of by basing its decision on the letter of the jurors' answers to my questions. I must consider the impression which the jurors made on me when they answered these questions, and also the nature of the malignancy and infection to which the jurors have been exposed.[1]

Bearing that in mind, I have come to the conclusion that, with the best intention in the world, the jurors who read such articles as are under consideration here will not be able wholly to erase the salient facts therein contained from their minds. Indeed the succeeding days of the trial, if it should be continued, would I fear serve almost inevitably to keep those facts fresh in their recollection.

In any event, however honest minded the jurors may be, such statements as were made in the objectionable articles would, I think, lurk in the background of their consciousness during their deliberations, and might, for example, cause them unconsciously to disregard the underlying requirement of a criminal case and to resolve any doubts they felt on the evidence against the defendants.

Accurately to prophesy the influence and effect on the minds of jurors of what I have called the contraband information contained in these objectionable articles is, in my opinion, as impossible as it would be to foretell with any certainty the course of an infectious disease among them. Cf. Latham v. United States (C. C. A.) 226 F. 420, 425, L. R. A. 1916D, 1118; People v. Fielding, 158 N. Y. 542, 547, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495; Tucker v. Henniker, 41 N. H. 325.

Therefore I conclude that the defendants no longer have insured to them a fair trial solely on the evidence admitted therein to which, whether guilty or innocent, they are entitled.

There is another consideration which is not without weight. It is highly important,

---

[1] Apposite cases in connection with such a situation are: Griffin v. United States, 295 F. 437 (C. C. A. 3, 1924); United States v. Ogden, 105 F. 371 (D. C. Pa. 1900); Meyer v. Cadwalader, 49 F. 32 (C. C. Pa. 1891); Vaughan v. Magee, 218 F. 630 (C. C. A. 3); Cohen v. United States, 27 F.(2d) 713 (C. C. A. 2, 1928); Allen v. United States (C. C. A.) 4 F.(2d) 688, 697; Itow v. United States (C. C. A.) 223 F. 25, 29; Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917; Holmgren v. United States, 217 U. S. 509, 30 S. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778; Holt v. United States, 218 U. S. 245, 250, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Cartwright v. State, 71 Miss. 82, 14 So. 526; Styles v. State, 129 Ga. 425, 428, 59 S. E. 249, 12 Ann. Cas. 176.

I think, that the course of justice in this court should seem, as well as be, free from all outside influence, direct or indirect.

If this trial should be allowed to proceed under the present circumstances and the defendants should be convicted, they and their counsel would probably always feel, whether justifiably or not, one could never know, that the result might have been otherwise if these objectionable articles had not reached the attention of the jury.

The responsibility in a motion of this kind rests wholly and finally on the trial judge. I should be loth to feel that the parties to any trial over which I have presided carried away from the courtroom the belief, or even the suspicion, that they had been convicted because, when I had a chance to do so, I had refused to protect them in their trial against such insidious influences as are here involved.