BARFIELD *v.* THE STATE.

294

No. 10108. August 13, 1934.

H. O. Hubert Jr., and Herschel Parham, for plaintiff in error.
M. J. Yeomans, attorney-general, Claude C. Smith, solicitor-general, B. D. Murphy, J. T. Goree, and L. C. Dickson, contra.

Russell, C. J.   Archie Barfield was tried under an indictment for murder, and was convicted without recommendation.   He filed a motion for a new trial, which was overruled, and to that judgment he excepted.   The deceased was a married woman, and the motive of the crime was evidently robbery.   The circumstances of the killing, as evidenced by the corpse, were barbarous and brutal. Several months elapsed without there being any clue to the perpetrator of the murder.   When the defendant was arrested, he with apparent readiness confessed to many persons, during his stay in jail, that he killed the deceased.   At other times when ques-

tioned he would make conflicting statements as to the circumstances of the murder and the extent of his participation in the crime, without expressly denying that he committed the homicide. It is unnecessary to recapitulate the evidence in detail; for it is conceded by counsel for the plaintiff in error that the evidence (which, aside from the confessions of the accused, was entirely circumstantial) will legally authorize a verdict finding the defendant guilty. The only defense raised at the trial was that the accused was insane at the time of the homicide and not able to tell the difference between right and wrong. Upon this pivotal point the evidence is in such conflict that a very slight circumstance might cause the balance to tip to one side rather than to the other.

In his motion for new trial the plaintiff in error alleges, in effect, that an untoward circumstance which occurred pending his trial was calculated to prevent the jury from giving a free and fair consideration of his only defense—that of insanity,—thereby depriving him at least of any opportunity to receive a modification of his penalty from that of death to confinement for life. It appears from the record, as approved by the learned trial judge, that the trial of the accused began on Thursday morning, August 31, 1933, and that the usual preliminaries of trial and introduction of evidence on behalf of the State consumed all of that day; and when the State closed and the defense would have been entitled to proceed with its testimony, the court took a recess until Friday morning. Before the court opened, three of the jurors were on the court-house porch in company with the sheriff and some others, when Mr. Lester Dickson, who had been employed to ascertain who committed the homicide and who was also assisting the solicitor-general in the trial of the case, came up and engaged in a conversation with the sheriff and others with him, and in the presence and hearing of the three jurors. As stated in the motion for new trial, "Movant further shows that after the trial of said case had proceeded all day Thursday, on Friday morning, September 1, 1933, at approximately 7 a. m., the jury in charge of the bailiff, Horace Lester, came out of the hotel at which they spent the night and proceeded to the Clayton County court-house. Upon arriving at the court-house most of the jurors went inside, but C. V. Phillips, S. A. Hudgins, and J. A. Thames stayed on the front porch to get a drink of water. While said jurors were on the front porch the

said Lester Dickson came up and made certain remarks in their presence and hearing, substantially as follows: that a specialist was coming down there to testify in the case, who would swear that the average man's intelligence was that of an eleven-year-old child; that he had used a specialist in a case of his once where his client was sentenced to hang, and had taken him before the Governor and saved his client's life; and that he thought he would have the specialist test the intelligence of the judge and some of the lawyers. Movant further shows that immediately upon the convening of court on Friday morning, a short time after said remarks were made in the presence and hearing of said jury by the said Dickson, the defendant called as his first witness Dr. Newdigate M. Owensby, a specialist in psychiatry; that the defense relied upon by the defendant in said case was that of insanity; and that Dr. Owensby was his main witness and his only expert witness upon whom he relied to establish his contentions. Movant further shows that after his remarks made before and in the presence of the jury that morning and during his argument to the jury, the said Lester Dickson referred to Dr. Owensby in a sneering and jocular manner; that he mispronounced the word psychiatrist, on one occasion calling it sycat-rix and on another cica-trix, well knowing the proper pronunciation of the word at the time and having heard it used on several occasions prior to his argument during the trial of the case; that he stated to the jury in said argument that these specialists had book learning, but that was all they knew; that he attempted to make capital out of the fact that the specialist, Dr. Owensby, had lived above the Mason and Dixon line, but upon objection by counsel for defendant the court instructed the jury that this was improper argument and that it should be excluded." The defendant's counsel did not object to this argument, as they would have done had they known what had transpired at the well.

It is apparent that the single question raised by this record is whether the defendant was entitled to a new trial for the reason, if upon no other ground, that the circumstances to which we have referred greatly diminished, if they did not entirely debar, the defendant's right to be recommended for life imprisonment. It makes no difference if the evidence against the defendant "demanded," as that word is ordinarily used, a verdict of guilty; for in a capital felony this court has more than once held that a ver-

dict without recommendation can not be demanded, since the recommendation of a jury as provided by law is not subject to any legal principle. The jury may, without any reason except their own wish, spare the life of one who is convicted of a capital felony. Three of the jurors swore that what was said by Mr. Dickson on the hotel porch had no influence on their decision in the case; that their verdict was based upon their opinion of the evidence, and upon nothing else. Mr. Dickson testified that at the time he was talking at the hotel he did not know that any jurors were present, and that had he known this he would have said nothing about the case. Furthermore it appears from the record, in response to a rule nisi issued by the court, that Mr. Dickson was tried for contempt of court, and very properly discharged. The matter of contempt, however, is altogether immaterial in the consideration of this ground of the motion for new trial. It appears from the record that Mr. Dickson was not a citizen of Clayton County, but was a citizen of Fayetteville; and it can be readily seen that in the progress of the trial on Thursday there would be nothing to call his special attention to any of those composing the jury, unless they had been previously known to him. Not so as to the jurors. The three jurors who heard the remarks in disparagement and ridicule of the defendant's expert witness, Dr. Owensby, although they may not have been personally acquainted with Mr. Dickson, knew from the proceedings of the previous day that he was an officer of court, a lawyer, and that therefore his views were entitled to consideration. In these circumstances, the implication that his (the expert's) testimony was altogether unreliable, in that he had in the past misused it to thwart justice in another case, and was going to be introduced for the same purpose in the case at bar, and was therefore entirely unworthy of belief, was calculated to debar the benefit of the testimony of this witness. It was also calculated to prejudice the case of the defendant upon his defense of insanity with respect to the testimony of any other witnesses who might be introduced in support of the plea of insanity. It must be remembered that the right of a jury to relieve one guilty of a capital felony from the infliction of the death penalty is not restricted by any law, and does not depend upon any other law except the wish of the jury. This principle has been so frequently announced by this court that citation of authority is unnecessary; and the right of the accused in

such a case has been deemed so precious, and the privilege has been so carefully guarded by this court, that it has been held that no verdict can be said to have been demanded by the evidence where the jury fails to make a recommendation. The question of whether one whom the jury believes from the evidence to be guilty of murder shall have his life spared is not one of law, but one of grace, based upon any sentiment which may appeal to the jury. The impulse to recommend the prisoner at the bar may arise from the slightest circumstance in the trial, or it may be based upon something not in the record but entirely dehors the record. The recommendation of a jury can not be challenged as an abuse of discretion in the face of the horrible circumstances of a particular crime; for this court has held that a recommendation can be made without the exercise of any discretion. Anything that is calculated to impair the privilege of the defendant to obtain relief from the infliction of the death penalty deprives him "pro tanto" to that extent of a lawful trial. This would be be true even were there no other evidence in the record that the defendant was insane; and it is especially true in this case, where several witnesses, including the sheriff and jailor of the county where the crime was committed, testified that the accused was crazy and did not know the difference between right and wrong.

It is a fixed rule of criminal jurisprudence that where the effect of a circumstance or occurrence may be hurtful to one on trial for a crime (even a petty offense), any doubt upon the subject will be resolved in favor of the accused, and the occurrence will be presumed to be hurtful and prejudicial to the full enjoyment of his rights. The jurors who heard Mr. Dickson's statement prior to the opening of court all swore that it had no effect whatever upon their minds, and that they reached the verdict rendered without reference to anything but the evidence. We have no doubt the witnesses were honest in this belief. In *Shaw* v. *State*, 83 *Ga.* 92, 98 (9 S. E. 768), Mr. Justice Simmons, delivering the opinion of the court, said: "The law in this State is, that where misconduct of a juror or of the jury is shown, the presumption is that the defendant has been injured, and the onus is upon the State to remove this presumption by proper proof. When the trial judge has decided, as in this case, that the State has removed that presumption and has shown that the defendant was not injured by the misconduct of the

jury, reviewing courts are loth to interfere with his finding upon that subject. This court, however, has in several cases reviewed and reversed the decision of the trial judge upon this subject, notably in the case of *Obear* v. *Gray,* 68 *Ga.* 182. So it is not the rule in this State, as it is in some others, that the decision of the trial judge upon this question will not be reviewed or reversed. The only trouble we have had in coming to our conclusion in this case is the great respect that we have for the judgment of the able and impartial trial judge who presided in the court below. When these grounds of the motion and the affidavits in reference thereto were read to us upon the hearing of this case, the misconduct of the bailiff and the jury appeared to be so gross that our minds reached the conclusion at once that the defendant ought to have a new trial. We apprehend that the judgment of the trial judge was based upon the affidavits introduced by the State, in which the jurors swore that they were not influenced by anything they saw or heard at the meeting; his conclusion therefrom being that the defendant was not injured by the misconduct of the jury, and that he was adhering to the letter of the law in overruling the motion on these grounds. There are many things which can be done by individual members of the jury, or by the whole jury, which are susceptible of such clear explanation that the trial judge would be authorized in refusing to set the verdict aside. There are other things, however, which if done by an individual member of the jury, or by the whole jury, are so contrary to the public policy of the State in the procurement of fair and impartial trials for the citizens of the State, as to require that a verdict . . be set aside, whether the defendant has been injured thereby or not; and in our opinion the case under consideration belongs to this class. The State is jealous of the rights and liberties of its people. When one of its citizens is accused of crime, it throws around him all the safeguards that are possible, in order to procure him a fair and impartial trial. It requires the officer who has charge of that particular jury to swear, in substance, in open court to take them to the jury-room and there keep them safely, and not to communicate with them himself or suffer any one else to communicate with them, unless by leave of the court. The law contemplates that when a jury are selected and sworn to try a citizen for felony, they shall be entirely separated from the world, and that no communication whatever shall be had with them, from

the beginning of the trial until the verdict is rendered, unless by leave of the court. It contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way; that the minds of the jury shall be entirely occupied with the consideration of the case which they are sworn to try. Let us apply these rules to the facts in this case. Here was a defendant on trial for his life. This jury had been selected to pass upon that issue. The bailiff had been sworn to keep them separate and apart from their fellow-citizens. In violation of this oath, without permission of the judge, he took them from their room, where he had sworn to keep them, to a prayer-meeting conducted by the prosecutor in the case. When they arrived there, they were shown to their seats by the prosecutor, who provided for them a place apart from the remainder of the congregation, and who led the services and addressed the congregation. Prayers were offered for the court and its officers. How long they remained there does not appear. For aught that appears in the record the house may have been crowded. One of the grounds of the motion alleges that there was 'shouting' at the meeting. What influence this shouting and religious excitement may have had upon the minds of the jury does not appear. It does not appear that Mr. Hooten, the prosecutor, was not among those who shouted. The jury seeing this going on, and seeing this prosecutor filled with religious zeal and fervor, may have reasoned in their minds, and doubtless did, that this man, who was the active prosecutor of the defendant, who assisted in the selection of themselves as jurors in the case, and who testified before them as a witness, by his conduct and declarations at the prayer-meeting showed that he was a good and upright man, and that such a man would not prosecute the defendant unless he believed him to be guilty. Some of them were perhaps members of his congregation, and looked up to him as their pastor and spiritual guide. We do not say, nor do we intend to intimate, that Mr Hooten designedly intended his actions to have an undue influence upon the jury; but who can say that they did not have this effect? Suppose that instead of the jury having been taken by the bailiff to the preacher, the bailiff had brought the preacher to the jury-room, and he had there addressed them, would any one say that this would not have been such gross misconduct as to require their verdict to be set aside? Sup-

pose, too, that in addition to carrying the preacher to the jury-room, the bailiff had carried his congregation, and that these exercises had been held in the jury-room, would any one say that their verdict should not be set aside? What difference does it make whether the jury is carried to the preacher and the congregation, or whether the preacher and congregation are brought to the jury? It is true that the jury say in their affidavits that these things did not influence their minds; but how can they tell—how can any man tell what particular facts and circumstances influence his judgment? *Woolfolk* v. *State*, 81 *Ga.* 551 [8 S. E. 724]; *Smith* v. *Lovejoy*, 62 *Ga.* 373; Thompson on Trials, 962."

In *Rainy* v. *State*, 100 *Ga.* 82 (27 S. E. 709), this court unanimously held: "Where during the trial of a criminal case the jury dispersed, and one of them was entertained at dinner free of charge by an attorney for the State, such conduct on the part of the latter is cause for a new trial, although the counsel for the accused knew of the same before the verdict had been returned. In such case the trial court should not, and this court will not, inquire whether injury resulted to the accused or not, but the verdict, upon principles of sound public policy, will be set aside, to the end that the purity of jury trial may be preserved unimpaired." In *Walker* v. *Hunter*, 17 *Ga.* 364, a new trial was granted because counsel for the prevailing party entertained for a night two of the jurors and the prevailing party. In *Springer* v. *State*, 34 *Ga.* 379, a new trial was granted where one of counsel engaged in the prosecution entertained and protected for a night, free of charge, horses of some of the jurors. In *Robinson* v. *Donehoo*, 97 *Ga.* 702 (25 S. E. 491), while other assignments of error were overruled, a new trial was awarded by the Supreme Court because two or three of the jurors remained in conversation with some one whom deponent did not know, for about fifteen minutes, and deponent did not know what was said. In connection with the subject generally see *Styles* v. *State*, 129 *Ga.* 425 (59 S. E. 249, 12 Ann. Cas. 176), in which the subject in question is fully discussed and numerous decisions cited.

The court erred in overruling the motion for a new trial.

*Judgment reversed. All the Justices concur, except Hutcheson, J., disqualified.*

BECK, P. J., and GILBERT, J., concur in the judgment.