Where the solicitor general declines the offer of one indicted for murder to plead guilty on condition that the accused shall receive a recommendation of mercy and a life sentence, and thereupon the defendant agrees to a stipulation of facts, including every element necessary to prove the crime as charged, expressly stating his desire to go to the jury on the question of punishment only, and makes a confession containing a plenary admission of guilt, the only question he is entitled to have submitted to the jury is the one of punishment, including a proper definition of the crime charged.
 No. 15049. JANUARY 6, 1945. REHEARING DENIED FEBRUARY 17, 1945.
Nathaniel Lamar and David Watkins were indicted for murder. The defendant Lamar was convicted, without a recommendation, and sentenced to death by electrocution. He moved for a new trial upon the general grounds, and by amendment added two special grounds, as follows: "1. . . The court, notwithstanding the plea of not guilty to the indictment, erroneously failed to charge the jury that they would have the right to acquit the defendant. 2. The court erred in charging the jury as follows: `Now, gentlemen of the jury, there has been admitted in evidence a statement, a statement as made and agreed to by the State's attorney and the defendant's attorneys which is admitted to be the true facts of the case, and which you will consider as evidence in this case.'" The trial court overruled the motion for a new trial; the exception is to this judgment. *Page 2 
When the case was called for trial, the following happened: The solicitor-general: "May it please the court, the defendant has proposed to the solicitor-general that he would enter a plea of guilty, provided the solicitor would recommend that the defendant be recommended for mercy; this the solicitor declined. The defendant therefore stands mute on arraignment, but upon trial will make his full and plenary confession, and ask the jury to recommend him to the mercy of the court. Therefore the court instructed the solicitor-general to enter a plea of not guilty." After the solicitor-general had made an opening statement to the jury, the following occurred: The defendant's attorney: "At this point the defendant offers to make a statement in which he will make a full and plenary confession of the guilt of the crime charged, as alleged in the indictment, and further of the material charges made by the solicitor-general in the statement of what the State expects to prove. In so doing, we obviated the necessity of further introduction of evidence by the State to prove these allegations. Upon so doing, further, we object to the introduction by the State of such evidence." The solicitor-general: "The position of State's counsel, as I started to say about it in the statement, is that the question of punishment in murder cases is entirely one for the jury. It is not the business of State's counsel to assume the responsibility of fixing that punishment. In fact, I don't think it lies in his power to do it; he would in any event only be permitted to make a recommendation to the jury about it. In this case, in all of its aspects, State's counsel doesn't feel it incumbent on him to make any recommendation to this jury at all in the defendant's favor, but puts it squarely up to the jury trying the case as to the question of what punishment should be meted out. For this reason we construe what my friend's answer is, standing mute; it is a question of guilt or innocence. Certainly this jury is entitled to know the gross aspects of this case and weigh it themselves, and for such reason as seems to them to be adequate to determine what the punishment should be. We don't know of any other way to handle it, sir, except to make out our case before this jury." The court: "You don't agree to let the defendant make a statement to the jury and admit all that has been said by the State and shift the responsibility to the jury as fixing the punishment?" The solicitor-general: "Well now, what has been *Page 3 
said by me to the jury has not been reported." The court: "He says he will admit that." The solicitor-general: "I think the only fair thing for the jury is, let them hear the evidence." The court: "All right." The defendant's attorney: "I understand your honor ruled on that? I didn't know." The court: "The defendant objects to it, that they be permitted to introduce the evidence." The defendant's attorney: "Now may I make this statement? May it be understood by the court and by the solicitor-general that this objection goes to each witness and to all of the testimony, so there will be no necessity for my bothering the court and the solicitor by repeating that objection." The embalmer who handled the body of the deceased was then introduced by the State, and he simply testified as to the nature and extent of the wounds which caused death. The court then recessed for lunch, and upon reconvening, the following occurred: The solicitor-general: "We have reached a stipulation, if your honor please, which we have completed for your honor, and our understanding is that our stipulation, along with the evidence of Mr. Stewart which has been introduced, will not require any further introduction of any evidence for the State. We have done this to shorten the trial and get the issue to the jury. That would constitute the evidence, except your honor will observe that the State may introduce some evidence in rebuttal of the defendant's statement, evidence to establish admissions which would not conflict with this agreement and which would contradict his statement. In other words, it must be material to this case." Thereupon the following stipulation was submitted to the court: "The following is a statement of the facts of the case as made by the solicitor-general as an opening statement:
"Mrs. J. J. Connell was an elderly lady about sixty-seven or sixty-eight years of age, and she was an aunt of Mr. Jesse Bush. Mr. Bush was operating a place of business known as the Green Lawn Grill, which is located on the North side of the Columbus Road and on the corner where the new Columbus Road comes into the old Columbus Road. Mrs. Connell was the housekeeper and she lived in the residence occupied by herself and Mr. Jesse Bush and Mrs. Jesse Bush. This residence was located about three-quarters of a block behind the place of business known as the Green Lawn Grill, which was a restaurant. Both the residence and the *Page 4 
place of business are outside the city of Macon, but they are both in Bibb County, and all that territory around them is in Bibb County. Mr. and Mrs. Bush opened up this place of business in June, 1939, and they have been operating it continuously since then. Mrs. Connell did little or no work about the matter of conducting the place of business; she stayed at home and looked after the affairs around the house.
"The defendant, Nathaniel Lamar, started working [with] Mr. and Mrs. Bush about December, 1939, and he has been working for them ever since, up to the night of Thursday, December 2d 1943, the night of the homicide. At one time during that period he served some time in the army of the United States for a period of about six or seven months. The co-defendant, David Watkins, started to work for Mr. and Mrs. Bush at a much later period. Nathaniel Lamar, at the time of the homicide, December 2d, or 3d 1943, the date depending upon whether or not the homicide took place before or after midnight, had worked himself up to the position of cook in the Green Lawn Grill. David Watkins was a waiter in this Grill. On or about December 21st, 1942, David Watkins separated himself from his employment at the Green Lawn Grill and he has not been employed there since. However, Mr. and Mrs. Bush both knew that David Watkins and Nathaniel Lamar were still associating with each other.
"On the night of December 2d 1943, Nathaniel Lamar was not on duty at the Green Lawn Grill. He received orders to report for induction into the United States Army on Monday or Tuesday of the next week, and he was given a leave of absence from his duties at the Green Lawn Grill for the whole day of Thursday. It was the custom of Mrs. Connell to keep all of the lights burning at the residence until Mr. and Mrs. Bush closed up the place of business and came home. Early in the evening of December 2d 1943, and until about eleven o'clock of that evening, Mr. Jesse Bush was in touch with Mrs. Connell, at the residence, and he saw nothing to indicate that anything was other than usual. However, he decided to send a maid by the name of Esther Redding over there and have her deliver some provisions for the family and some feed for the dogs and chickens, and he told her to wait until Mr. and Mrs. Bush had closed the place of business. She went over there about ten or fifteen minutes after twelve *Page 5 
o'clock, and she found, when she got there, that the side door, on the new Columbus Road side was not locked, and she opened that door, and she was met in the face with fumes from a fire, and she saw that the lights were still burning in the house, and she did not see Mrs. Connell. She immediately returned to the place of business and reported what she had found, and Mr. Bush went up there immediately and found that it was difficult to enter the house because of the smoke; however, he did go on into the house, and he did find out that the smoke was coming from a fire in the bedroom of Mrs. Connell. With the assistance of the maid and of Mrs. Bush, he got water and put this fire out. The fire was burning the bed of Mrs. Connell in her bedroom. After this fire had been put out, Mr. Bush discovered that he could not breathe very well in the atmosphere, although the smoke had been cleared out. Further investigation by Mr. Bush, and by the officers who were called in later, revealed that the gas heater in Mrs. Connell's room in the house and another gas heater in the front bedroom had been turned on, that is to say, that the valves were open and the gas was escaping, but this was butane gas and it is heavier than air, and this butane gas had made a layer of gas on the floor; but fortunately it had been discovered before this layer of gas built itself up to the point where the fire was burning on the bed, otherwise there would have been an explosion and the entire house would have been consumed very quickly.
"Nathaniel Lamar knew that Mr. Bush had an arrangement with Mrs. Connell whereby Mrs. Connell kept certain amounts of money for the operation of the business, because, from time to time, it has been necessary for Mr. or Mrs. Bush to send Nathaniel Lamar up to the house to get change for the operation of the business. Sometimes a customer would present a large bill, like a $100 bill or maybe a $20 bill, and somebody had to be sent up to the house to get change. Sometimes and especially late at night, it might be necessary to send up to the house to even get change for a $5 bill. Nathaniel Lamar had been sent up there many times for this purpose.
"Some time about Thanksgiving in 1943, Mrs. Connell had made a fruit cake. She had promised some of this fruit cake to Nathaniel Lamar, and she had some of the fruit cake left at the time she was killed. Nathaniel Lamar and David Watkins were good *Page 6 
friends and close associates while they both worked at the place of business of Mr. and Mrs. Bush. After Watkins had been dismissed or separated himself from this place of business, about December, 1942, they still remained good friends, and Lamar went out with Watkins at various times, and Watkins called up frequently at the place of business and made engagements for him and Lamar to go off together after Lamar had finished his work at the Green Lawn Grill. Neither of them had any legitimate business at the Green Lawn Grill on the night of December 2, 1943, or at any time during that night. Officers of the sheriff's office of Bibb County received a report of the homicide about 12:30 on the night of December 2, 1943, and they went out to the place of business of Mr. and Mrs. Bush, and they saw the body of Mrs. Connell in her bedroom, and they got certain information out there from Mr. and Mrs. Bush and from the negro maid, Esther Redding. They then made a search for the whereabouts of Nathaniel Lamar and David Watkins. They found them at the storehouse and dance hall operated by a negro man named Strickland, the place being known as `Strick's Place.' They were there with a girl named Emma Lattimore, who is a sister of Nathaniel Lamar. There was a taxicab in front of the place and they found that the negro girl, Emma Lattimore, had in her purse $840 in money and a 38-caliber pistol: they found in the taxicab $170 in money and $51 behind the seat in the taxicab. They found $5 (one $5 bill) on the ground by the side of the taxicab; all of this, with the $840 found in the purse of Emma Lattimore, constituted the gross sum of $1066. They took the girl, Emma Lattimore, and Nathaniel Lamar and David Watkins into custody and carried them to the City Hall in Macon. The negro girl could not account for the presence of this pistol in her purse or for the presence of this large sum of money in her purse, except that she said, and will now testify, that David Watkins, while she was sitting next to him in the taxicab, slipped something into her purse and said, `Please keep it, it will be safe;' she will testify that she thought it was a small bottle of liquor or something to that effect. Officers from the sheriff's office later searched the home of Nathaniel Lamar in Unionville, which is a negro settlement just outside of the City of Macon, and found a tin box containing $855 in money. He had $17 on his person.
"Officer J. C. Smith, of the bureau of investigation of the Macon *Page 7 
police department, found a fingerprint on the frame of the door leading from the hall into the dining room in the home where Mr. and Mrs. Bush lived with Mrs. Connell. This fingerprint was made in blood. Officer Smith also found a fingerprint on a gas heater in the bedroom of Mr. and Mrs. Bush, made in blood, and that is identified as the fingerprint of Nathaniel Lamar. The metal pipe, which was part of the fan stand, and which was recovered by officers from the sheriff's office, was found stained with what has been definitely determined by Mr. Smith as human blood. Stains were found on the coat and trousers and shirt and handkerchief found on the person of Nathaniel Lamar, and these were subjected to chemical examination by Mr. Smith and they were found to have been caused by human blood. Stains were found on the coat, trousers, and shoes of David Watkins, and they were found to have been caused by human blood. Red stains were found on the 38-caliber pistol found in the purse of Emma Lattimore, and these were subjected to chemical examination by Mr. Smith, and they were found to have been made by human blood. There was human hair on the piece of metal pipe, and there was human hair and blood on the circular base of the fan stand, and there was hair of the same texture on it. The embalmer found that Mrs. Connell had been beaten and cut with blunt and sharp instruments, and his testimony is in the record and no further reference need be made here.
"After Nathaniel Lamar and David Watkins had been arrested, they freely and frankly told the officers about their participation in this matter. Nathaniel Lamar said that they had been planning this thing for about thirty days and that on Thursday, December 2, he telephoned the aunt of David Watkins, who is a woman named Mary Frye, who is a cook and maid working for Mr. Ben Goldman on Hill Crest Avenue in Macon, and told her to tell David to be sure to get in touch with him that night; he said that David Watkins did get in touch with him, and that they went out together, and that he told David Watkins that Mrs. Connell had promised him some fruit cake, and that he would go up to the house and ask her to give him the fruit cake which she had promised him, and that she would admit him to the house, and that what David Watkins needed to do was to stand on the outside and keep watch and whistle to him if anybody approached; *Page 8 
he said that he went to the house, and he told Mrs. Connell that he had come for his fruit cake, and that she went with him to the kitchen and she got out the fruit cake and was slicing it; and that he, Nathaniel Lamar, picked up the fan stand and struck her over the head with it, and that the base of it fell off and that he continued to strike her three or four more times; that he found the keys that Mrs. Connell usually carried on her person on the dining-room table, and that he went in and unlocked the drawer of the desk and opened the drawer and got out the money; in the meantime, he said that David Watkins came in, and he hit the old lady too, and then they both dragged her from the kitchen into her bedroom, and then David Watkins, at his suggestion, lighted a paper and set fire to the bed, and then he turned on the gas in both rooms with the idea of destroying the building and with the idea of destroying the evidence; that he and David Watkins then left the building, with Watkins carrying the money, and they went to the home of Lamar, and they divided the money, as best they could, and then they went down to Alemita's place and struck up with Emma Lattimore, and persuaded her to go with them to the Cotton Club on Broadway; he said that they stayed at the Cotton Club a while and bought some beer, and then they went in a taxicab to Fat Jack's place in East Macon and they bought some sandwiches and beer at Fat Jack's place, and went to Strick's place in Unionville, where they were arrested. David Watkins told the officers about the same thing, except that he said that he did not help Nathaniel Lamar drag the body of Mrs. Connell from the kitchen to the bedroom; he said that Nathaniel Lamar did that by himself. He said that it was not his idea to burn up the place, but he admitted that he lighted the paper and put it under the bed at the suggestion of Lamar.
"Georgia, Bibb County. In the Superior Court of said County. In this case, counsel for the prisoner agree that the above and foregoing facts stated by the solicitor-general in the opening statement of the case, after a jury had been selected, is a statement of the facts of the case which can be substantiated by witnesses for the State. We ask for the privilege of allowing the defendant to make a statement about the matter, which will be a full and plenary confession of his guilt, with the privilege extended to the solicitor-general to rebut this statement in any particular where it conflicts *Page 9 
with the above and foregoing statement or with reference to any other conflicting material question of fact, it being the desire of the counsel to submit this case to the jury purely on the question of punishment. This agreement is made, both by the counsel for the defendant and the solicitor-general, for the purpose of submitting this case to the jury on the question of punishment. This January 17, 1944. (Signed by the defendant's counsel and the solicitor-general.)
"Georgia, Bibb County. In the Superior Court of said County. The foregoing stipulation and agreement made by counsel for the defendant, and by the solicitor-general representing the State, in the case of The State vs. Nathaniel Lamar, Indictment No. 4170, Bibb superior court, December term, 1943, is hereby approved by the court. Let the same be read in evidence as part of the evidence in said case, which, with the statement of the defendant and other oral evidence introduced, will constitute the brief of evidence in said case, this stipulation to be considered as part of the evidence, and the facts referred to in the statement of facts upon which the stipulation is based to also be considered as part of the evidence. In open court, this 17th day of January, 1944." (Signed by the presiding judge.)
The defendant then made his statement to the jury, in which he made a full and complete confession of guilt. The State thereafter offered testimony in rebuttal of some minor details of fact contained in the defendant's statement. The court thereupon charged the jury, and the verdict above indicated was returned.
The plaintiff in error did not enter a formal plea of not guilty, but by direction of the court the plea was entered by the solicitor-general. No question is raised as to the correctness of this procedure. It will be noted that counsel for the defendant in the court below said, "At this point the defendant offers to make a statement in which he will make a full and plenary confession of the guilt of the crime charged," and thereupon objected to the State offering any testimony as to the defendant's guilt. Thereafter he entered into a stipulation containing all the facts necessary to constitute the crime charged. The stipulation, among other *Page 10 
things, contained the language, "We ask for the privilege of allowing the defendant to make a statement about the matter, which will be a full and plenary confession of guilt;" and the further language, "it being the desire of counsel to submit this case to the jury purely on the question of punishment." Thereafter the defendant in his statement to the jury did make a full and plenary confession of his guilt. He ended his statement with this language, "I am begging you twelve good white men to let me live and pay for what I did with a sentence for life in the penitentiary."
The punishment for murder is death unless the jury recommends mercy, in which case the punishment is confinement in the penitentiary for life. Code, § 26-1005. "The jury may, without any reason except their own wish, spare the life of one who is convicted of a capital felony." Barfield v. State, 179 Ga. 293,297 (175 S.E. 582); Hill v. State, 72 Ga. 131;Thomas v. State, 89 Ga. 479 (15 S.E. 537); Taylor v.State, 105 Ga. 746, 781 (31 S.E. 764); Hackett v. State,108 Ga. 40 (2) (33 S.E. 842); McCrary v. State, 137 Ga. 784
(4) (74 S.E. 536).
We hold that under all of the circumstances of the instant case, the only question submitted to the jury by the defendant in the court below was whether his punishment should be death or life imprisonment. He admitted the crime and asked for nothing better than life imprisonment. He stipulated the facts in order to prevent the personal appearance of the witnesses against him, and therein expressed his desire to go to the jury on the question of punishment only. He was, therefore, entitled to have the question he made, to wit, death or life imprisonment, submitted to the jury. No exception was taken to the charge on murder or malice, nor is it contended that the law on the question of punishment was not correctly given.
This court in Manchester v. State, 171 Ga. 121 (2) (155 S.E. 11), said: "Where the solicitor-general declines the offer of one indicted for murder to plead guilty on the condition that the accused shall receive a recommendation of mercy and a life sentence, it is incumbent upon the State, in the absence of a confession containing a plenary admission of guilt, to prove all the essential facts in support of the allegations of the indictment. It was therefore not error, upon announcement of counsel that the defendant `stands mute on arraignment, and at the proper time he will make *Page 11 
his confession and ask the jury to recommend him to the mercy of the court,' for the judge to require the State to prove every essential allegation in the indictment and to instruct the jury on the issue of the defendant's guilt, the law of murder, presumption of innocence, malice, deliberation, and the defendant's statement."
In the instant case there was "a confession containing a plenary admission of guilt." It follows that there is no merit in any of the contentions made by the plaintiff in error, and there was no error in overruling his motion for a new trial.
Judgment affirmed. All the Justices concur.