[Sac. No. 555.   Department One,–July 27, 1899.]

## H. D. WRIGHT et al., Appellants, v. LAFAYETTE EAST-LICK et al., Respondents.

NEW TRIAL—MISCONDUCT OF JURY—CONVERSATION, DRINKING, AND CAROUSAL WITH PARTIES.—The misconduct of jurors whose concurrence was essential to the verdict, in conversing about the case with parties to the action, and in drinking and carousing with one of the prevailing parties, is such misconduct as entitles the losing parties to a new trial, irrespective of counter-affidavits that the treating of and drinking with the jurors was indulged in by both parties to the litigation, and that their verdict was uninfluenced by the misconduct complained of.

APPEAL from a judgment of the Superior Court of Siskiyou County.   J. S. Beard, Judge.

The facts are stated in the opinion of the court.

James F. Farraher, and J. H. Magoffey, for Appellants.

Gillis & Tapscott, George D. Butler, and I. A. Reynolds, for Respondents.

VAN DYKE, J.—This action involves a contest regarding a line dividing mining claims in Siskiyou county.   The trial was by jury, and the verdict and judgment for the defendants.   The appeal is from the judgment and from an order refusing the plaintiffs' motion for a new trial.   Among the grounds of the motion for a new trial is the alleged misconduct of the jury. And this is pressed on the appeal.   The misconduct complained of relates principally to the jurors John Neville and John B. Lowden, the former of whom was elected and acted as foreman.   The affidavits produced in support of the motion for a new trial show that during the progress of the trial Neville approach the plaintiff, H. D. Wright, and stated to him, that he, Neville, "was going to do the right thing; that he was pretty well satisfied who the right one was, and that he was a pretty good talker, and could make the jury see things in the right light."   This occurred just prior to the departure of Neville from Yreka to Montague.   On arriving at Montague he told

James M. Davidson, a witness in the case, and John T. Bradley, that plaintiff Wright had, during the trial of the case, approached him and commenced to talk with him about the said cause, and that he had told said Wright to stop talking to him about the case, and that if he did not that he would report him to the court. Said Neville also stated to Charles J. Fry during the progress of the trial that appellant Wright had attempted to talk to him about the trial for the purpose of influencing him in his verdict. The affidavit of Wright contradicts point blank this statement of the juror Neville; and, on the other hand, it is stated in Wright's affidavit that Neville attempted to approach him and talk about the case, and in his denials and affirmative statements Wright is corroborated; and Neville, in his counter-affidavit, does not attempt to controvert or impeach Wright's affidavit.

It is further shown by the affidavits of several parties that pending the trial, and on New Year's eve, Neville attended a dance at Hawkinsville, some two and one-half miles from Yreka, in company with W. W. Eastlick, one of the defendants. They went together in the same conveyance to the dance, and returned in like manner to Yreka. During the night of the dance at Hawkinsville they drank and got drunk together; were "partners," and frequently walked alone from the dancehall to the saloon and appeared to be quite intimate. Just prior to attending this dance Neville stated to one of his cojurors, Elliott R. Taylor, that he, Neville, was broke. On the day after John Lowden, who, it appears, had been an intimate associate of Neville during the progress of the trial, stated to juror Taylor that Neville had made "a killing of ninety-seven dollars." And Neville, on his return from the dance, stated to juror Taylor that he "blowed in a deal of money."

Shortly after the discharge of the jury, Neville approaching defendant Wallace Eastlick, with whom he went to the Hawkinsville dance, said: "Well, old man, I brought in a verdict for you all right." And juryman Lowden was seen talking to the defendant Lafayette Eastlick, in a secreted place in the rear of a saloon. Lowden and Neville went buggy-riding during the trial and one Whipple, a nephew of defendants Eastlick, held the team while they took a drink; and they also drank with the

defendants Eastlick, and visited their brother together while they were both drunk.

The counter-affidavits go to show that juror Neville, aside from his intemperate habits, was considered a good man and citizen, and that the treating and drinking was not all on one side, but was indulged in by both parties to the litigation. The conduct of these two jurors, principally foreman Neville, visiting saloons and going to dancehouses, and drinking and carousing with parties to the action, is not controverted by respondents' counsel, but they seek to extenuate the same. They say: "The parties, the witnesses, and some of the jurors were miners; they were away from home; and the trial lasted over the holidays; and, while these things were not to be encouraged, still all that is shown in this case is the following out of the very general custom throughout the mining districts, and we think that no one who is at all familiar with the custom of miners in this state will say that because one or two jurors happened to be present and joined when the crowd was invited up to take a social drink during the holidays that the verdict was tainted thereby." It is scarcely to be credited that such misconduct on the part of the jurors, as the record in this case discloses, is but following out the custom, either general or local, throughout the mining district of this state. If there were such a custom, surely it "would be more honored in the breach than the observance." It is to be presumed that when jurymen are selected and sworn to try a cause, either in the mining or other districts in this state, they realize the obligation of their oath, and their duty as good citizens toward the community, and act accordingly. In the early '60's a district judge in this state, whose district embraced mining counties, was impeached on the ground, among others, that during the trial of a cause he left the bench and visited a saloon and there drank and caroused with witnesses and the parties, or one of the parties. If a judge may not do these things, why should the jury, or member of the jury, be allowed to do so? By the constitution trial by jury is secured to all, and the judge is prohibited from charging the jury with respect to matters of fact; and by the law of the state the jury "are the judges of the effect and weight of evidence." (Code Civ. Proc., sec. 2061.) The jury,

therefore, while engaged in the trial of a cause, forms a very important part of the tribunal. A wrong verdict, resulting from prejudice or misconduct of the jury, or members thereof, is more detrimental to a party litigant than an error of law committed by the trial judge; an error at law can readily be corrected on appeal, whereas if the testimony appears to be substantially conflicting the verdict must be allowed to stand, although resulting from secret or undiscovered prejudice or misconduct.

It goes for nothing that the jurymen in this case say that their verdict was uninfluenced by the misconduct complained of. As said in *People v. Stokes*, 103 Cal. 196, 42 Am. St. Rep. 102: "A juror is not allowed to say: 'I acknowledge to grave misconduct; I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the jury-room.' The law, in its wisdom, does not allow a juror to purge himself in that way." (See, also, *People v. Azoff*, 105 Cal. 632; *Woodward v. Leavitt*, 107 Mass. 466; 9 Am. Rep. 49.) The verdict in this case was by the bare constitutional number required of nine to three, and the result might have been different if it had not been for the misconduct complained of. However, as said in *Palmer v. Railway Co.*, 2 Idaho, 290: "It is not necessary for us to find that this conduct had any effect upon the verdict in order to sustain this motion for a new trial. It is enough to say that it is calculated to do so." Again, it is said in *McDaniels v. McDaniels*, 40 Vt. 374, 94 Am. Dec. 408: "There is no practical method to so analyze the mental operations of the jurors as to determine whether, in point of fact, the verdict would have been the same if the trial had been conducted as both parties had the right to expect, according to law and upon the evidence in court. The court should set aside the verdict in justice to itself as well as to the parties, that the trial may be conducted fairly, so that the verdict, when rendered, may be entitled to the respect of both parties and the confidence of the court." Thompson on Trials, section 2564, states the rule as follows: "Where the jury has been treated, fed, or entertained by the successful party or his counsel, or at the expense of either, a new trial will, in nearly all cases, be granted. This rule is, by most courts, deemed in-

dispensably necessary to preserve the integrity of juries; it being, as already stated, a rule of public policy, it will be enforced without reference to the question whether or not the verdict was right."

We cannot be too strict in guarding trials by jury from improper influences. This strictness is necessary to give due confidence to parties in the results of their causes; and everyone ought to know that for any, even the least, intermeddling with jurors a verdict will be set aside. (*Knight v. Freeport*, 13 Mass. 218.)

On the showing made in this cause the court below should have granted a new trial. The conclusion we have arrived at renders it unnecessary to consider the other points made by the appellants.

Judgment and order denying a new trial reversed.

Harrison, J., and Garoutte, J., concurred.

Hearing in Bank denied.