## Capps v. State.

## Opinion delivered July 14, 1913.

1. New trial—Testimony of juror.—Under Kirby's Digest, § 2423, providing that "a juror can not be examined to establish a ground for a new trial, except it be to establish as a ground for a new trial that the verdict was made by lot," testimony of a juror that he and other jurors read articles in newspapers concerning the trial, is not competent. (Page 197.)

2. Trial—Misconduct of juror.—It is improper for a juror to discuss a cause which he is trying, or to receive any information about it, except in open court, and in the manner provided by law. (Page 199.)

3. Trial—Misconduct of juror—Reading newspaper accounts of trial.—While jurors should never read newspaper accounts of the progress of a trial, yet the mere reading of a newspaper account of a trial does not necessarily call for a reversal of a case, if the article contained nothing of an unfair or prejudicial character, and gave no intimation to the jury of the effect of any evidence or the weight given it by the public. (Page 199.)

4. Trial—Misconduct of jury—Reading newspaper articles.—Where in a trial for homicide, the jury read newspaper articles which were not a mere narrative of what had occurred within the view of the jury, but which would convey to the jury the idea that

public sentiment had crystalized into the conviction that the defendant was guilty, the judgment of conviction will be reversed. (Page 203.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed.

*Jesse A. Harp* and *G. W. Dodge,* for appellant.

1. The misconduct of the jury in mingling with other guests of the hotel where they stayed, and in reading in both of the daily papers the sensational accounts of the case therein contained, is alone sufficient to reverse this case. The burden was on the State to prove that no prejudice resulted to the defendant. 44 Ark. 120.

Where a defendant in a criminal case has been prejudiced by the reading of newspapers by the jury, the verdict is vitiated. 42 Am. St. Rep. 102; 37 Pac. 207; 146 Cal. 561; 80 Pac. 681; 129 Ga. 425; 59 S. E. 249; 12 Ann. Cases, 176; 92 Ia. 455; 61 N. W. 179; 124 Ia. 147; 111 N. W. 443; 71 Miss. 82; 14 So. 526; 9 Mont. 508; 24 Pac. 213; 9 Lea, 440; 20 W. Va. 713; 43 Am. Rep. 799; 105 Fed. 371.

2. The verdict is not sustained by the evidence.

3. The verdict is defective and wholly insufficient to support a judgment of conviction. Kirby's Dig., § 2409; 26 Ark. 325; 2 Bishop on Crim. Proc., § 565; 7 Ia. 236; 11 Ala. 618; 1 Morris, 476; 7 Vt. 259; 3 O. St. 89; 4 Tex. 410; 12 Md. 514; 11 Gray, 438; *Id.* 8; 12 Allen, 170; 26 Ark. 333; 34 Ark. 649; 67 Ark. 27; Kerr's Law of Homicide, § 542; 58 Ark. 233; 71 Ark. 100; 57 Ark. 267; 58 S. W. (Ark.) 350; 143 S. W. 935; 94 Ark. 548.

4. The court's action in refusing to grant a new trial on the ground of newly discovered evidence, consisting of a confession by Bertha Capps that she had sworn falsely in material matters at the trial of the defendant, was manifest error. 44 Tex. 642; 1 Ben. (U. S.) 145.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The affidavit of the foreman of the jury, touching the alleged misconduct of the jury, was inadmissible.

Kirby's Dig., § 2423; 29 Ark. 293; 59 Ark. 132, 140; 67 Ark. 266, 273. Inasmuch as the trial judge heard the testimony on this point, and was in a better position to judge of the truth of the charge of misconduct, than is this court, his action in overruling appellant's objections will not be disturbed unless there has been a manifest abuse of discretion. 40 Ark. 454, 469.

2. The verdict is sufficient to sustain the conviction because (1) the court instructed the jury that if they found the defendant guilty of murder in the first degree to return a verdict in the form which they adopted. 109 N. W. (Ia.) 1006. (2) This rule concerning the form of verdict in murder cases was adopted in an early case in this State. 26 Ark. 325. See also 7 Ia. 236; 71 Ark. 100; *State* v. *Wiese,* 4 N. W. (Ia.) 827, 828, and cases cited.

3. Where newly discovered evidence is merely cumulative or contradictory in its nature, there is no ground for a new trial. 66 Ark. 523; 69 Ark. 545; 72 Ark. 404, and cases cited.

Smith, J. The appellant was indicted for the crime of murder in the first degree, alleged to have been committed in the Greenwood District of Sebastian County, after premeditation and deliberation, by tying Rose Capps and Priscilla Capps in the bed, upon which they slept, and by then and there perpetrating the crime of arson by setting fire to and burning a certain house which they occupied, and which said house was under the control of the said Marion Capps, and thereby wilfully and feloniously caused the death of the said Rose Capps and Priscilla Capps by then and there causing them to be burned to death. The venue was changed to the Fort Smith District, and, upon a trial there, appellant was found guilty and appeals to this court from the judgment sentencing him to hang. A number of exceptions were saved at the trial and are assigned here as error calling for the reversal of the case. Among other grounds upon which a reversal is asked are the discovery of new evidence and the insufficiency of the evidence, but in view

of the fact that the case will be reversed for another reason, we do not discuss those assignments of error. No exceptions were saved to any of the instructions, and, as the other errors complained of are not likely to occur at another trial, we discuss only the error, which in our judgment calls for the reversal of the case, and this error is the misconduct of the jury in reading, and in being permitted to read, newspaper articles relating to the trial.

It was also objected that the verdict of the jury was insufficient to support a judgment imposing the death sentence for the reason that it did not declare the degree of the homicide of which the defendant was guilty. Section 2409 of Kirby's Digest reads as follows:

"The jury shall, in all cases of murder, on conviction of the accused, find by their verdict whether he be guilty of murder in the first or second degree; but if the accused confess his guilt, the court shall impanel a jury and examine testimony, and the degree of crime shall be found by such jury."

The judge in his charge to the jury gave them the following directions:

"Gentlemen: If you find the defendant guilty of murder in the first degree, the crime with which he is charged in the indictment, write your verdict, 'We, the jury, find the defendant guilty as charged in the indictment.'

"If you find him guilty of murder in the second degree, write your verdict, 'We, the jury, find the defendant guilty of murder in the second degree, and assess his punishment at a term in the State penitentiary of not less than five nor more than twenty-one years, the time to be fixed by you, not less than five nor more than twenty-one years.'

"If you find the defendant not guilty, write your verdict, 'We, the jury, find the defendant not guilty.'

"If you find him not guilty on the ground of insanity, state that fact in your verdict."

The jury returned the following verdict: "We, the

jury, find the defendant guilty as charged in the indictment." It is contended that, although this verdict, read by itself, does not state the degree of the homicide, it is yet made definite and certain by reference to the charge of the court; that the verdict returned employed exactly the language which the court directed to be used in the event appellant was found guilty of murder in the first degree. The courts are divided on the question of the sufficiency of such verdicts, and eminent authority could be cited upon both sides of the question of the sufficiency of this verdict. Unquestionably the verdict would be insufficient except by reference to the charge of the court, but, as we are reversing the case upon another ground, we pretermit any discussion of its sufficiency here as that question is not likely to arise upon another trial.

The newspaper articles complained of were published in the Fort Smith Times-Record, and the Southwest American, daily papers published in that city, and each was shown to have had a large circulation. The foreman of the jury testified upon the hearing of the motion for a new trial that he and other jurors read these articles. But this evidence was not competent for that purpose and would be insufficient to support a finding that members of the jury had read these articles, because jurors are not thus allowed to impeach their verdict. Section 2423 of Kirby's Digest; *Wilder* v. *State,* 29 Ark. 293. *Smith* v. *State,* 59 Ark. 132; *Hampton* v. *State,* 67 Ark. 266. But the finding that the papers had been read by the jury did not depend alone upon the affidavit of the jurors, as the officer in charge of the jury and the proprietor of the hotel at which the jury was being entertained testified that the jurors bought these papers and some of the jurors read them, and that other jurors had access to the daily papers belonging to the hotel and read them as other guests did. These articles were very lengthy, extending over several columns of each of these papers, and we will not set them out, *in extenso,* but copy the following excerpts from them:

(Fort Smith Times-Record):

### "HEARS HIS CHILDREN TELL HOW HE TRIED TO BURN THEM TO DEATH IN THEIR BEDS.

"Calmly and dispassionately Bertha and Ellis Capps told the jury in the circuit court this morning a story that, if not broken down, will send their father, Marion Capps, to the electric chair, that mode of capital punishment having been substituted by the present legislature for hanging.

#### "THE FLAME-SCARRED BROTHER.

"Ellis Capps, aged fourteen years, bore plainly the evidence. of his close call from death in the flames in scars that disfigured his forehead and hands and mutilated one ear. His testimony did not materially differ from that given by his sister.

#### "NEIGHBOR TESTIFIED TO ROPE—CAPPS FEARED MOB.

"Wiggington says Capps expresses desire for officer to make haste to get him to a place of safety, as it was horrible affair and was afraid neighbors do him bodily harm."

And the following excerpts are taken from the Southwest American:

"Children testify that father murders three by firing home, other witnesses for the State told of finding ashes held in perfect form of charred rope, across the breast of the children who met death in the house."

"Judge Harp was scored by the court by the non-arrival of a witness from Jenny Lind, whose absence caused a halt in the case. Shortly afterward, when counsel. attempted to place on stand a witness who had been given the privilege of court room throughout hearing, Judge Hon again grew warm in his remarks. to Judge Harp, and said condemned counsel's action in case of missing witness as well as in other case."

#### "ON CROSS EXAMINATION WIGGINGTON.

"Said he saw big oil can in the ruins. The top dented, no flames issuing from the holes. The prosecution contends that this proves the can had been emptied

of oil and that there was no explosion. Had there been an explosion the State asserts the can would have been torn and battered."

"Every one of the three witnesses who testified at the morning session gave startling testimony.

"In fact their stories constitute a series of sensa- tions. Hardly had the audience recovered from the sur- prising recital of fifteen-year-old Bertha Capps, than Ellis, aged fourteen, droopy-eyed and weary, his hands and face disfigured by the ravages of the fire and stand- ing as mute evidence of the child's horrible experience, startled the spectators with his testimony. The story of the children corroborated in detail, but with one or two minor exceptions, both related their testimony in a straightforward manner and every neck in the room was stretched so that not a word would escape the listener.

"Their testimony was delivered without emotion, except toward the closing part of the girl's cross exami- nation when her answers became haughty and snappy. She finally broke into tears as she dramatically ex- claimed, after she had given shocking testimony, that 'I would tell the same story if I was on my dying bed.'

"Despite the insistent and repeated efforts of coun- sel for the defense to shake stories of the children the youthful witness remained firm. Said father read them twentieth chapter of St. John from the Bible. She did not know that the subject dealt with the resurrection."

It is always improper for a juror to discuss a cause, which he is trying as a juror, or to receive any informa- tion about it except in open court and in the manner pro- vided by the law. Otherwise some juror might be sub- jected to some influence, which would control his judg- ment, something might be communicated to him which would be susceptible of some simple explanation which could not be made because of the ignorance of the in- fluence to which the juror had been subjected. But while jurors should never read the newspaper accounts of the progress of the trial for fear they might be influenced by something which was not in evidence and which had

not occurred in the view of the jury, yet the mere reading of a newspaper account of a trial does not necessarily call for the reversal of the case, if the article contained nothing of an unfair or prejudicial character and gave no intimation to the jury of the effect of any evidence, or the weight given to it by the public. *People* v. *Leary,* 105 Cal. 486, 39 Pac. 24; *People* v. *Gafney,* 1 Sheld. 304, note 6, 50 N. Y. 416; *Commonwealth* v. *Fisher,* 134 Am. Stat. Reports, 1056. A leading case upon the subject of newspapers read by the jurors engaged in a trial, and the effect of such conduct upon the part of the jurors, is the case of *Styles* v. *State,* 12 Am. & Eng. Ann. Cases, 176, 129 Ga. 425, and in this case Justice Atkinson, speaking for the court, said: "The State is jealous of the rights and liberties of its people. When one of its citizens is accused of crime, it throws around him all safeguards possible in order to procure for him a fair and impartial trial. It requires the officer who has charge of the particular jury to swear in substance in open court to take them to the jury room and there keep them safe, and not to communicate with them himself or suffer any one else to communicate with them, unless by leave of the court. The law contemplates when a jury is selected and sworn to try a citizen for felony they shall be entirely separate from the world and that no communication whatever shall be had with them from the beginning of the trial until the verdict is reached, unless by leave of the court. It contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way; that the minds of the jury shall be entirely occupied with the consideration of the case which they are sworn to try." It will be observed that the oath taken by the officer in charge of the jury in that State is very similar to the oath which the court administers to the officer in charge of the jury, upon each adjournment of the court, in this State. Section 2390, Kirby's Digest. And the court there further said: "When a juror enters upon the trial of a crimi-

nal case, the law contemplates his withdrawal from the
public and makes no provision for addresses to him from
outside sources, for his entertainment or otherwise, which
are calculated directly or indirectly to excite any pas-
sions or emotions with respect to the matter upon which
he is to sit in judgment. Perfect impartiality in the
juror is the object of the law. Anything not legitimate,
arising out of the trial of the case which tends to destroy
the impartiality of the juror, should be discountenanced."
And in the same opinion the following language was
quoted with approval from the case of *Cartwright* v.
*State,* 71 Miss. 82, 14 Southern, 526: "That this method
of communicating to and impressing upon the jury, or
any member of it, the opinion of others is open to the
same condemnation which would be visited upon oral
expression of opinion touching a defendant injected into
the body of the jury by some designing intermeddler.
The widely read and influential daily journal, speaking
for, as well as to the public, reflecting public sentiment
as well as making it, must be held to be much more pow-
erful in influencing the average man than any expres-
sion of opinion by a single private individual." And in
the note to this Style case, *supra,* the following language
is quoted from the case of *State* v. *Caine,* 134 Iowa, page
147, 111 N. W. 443:

"The accounts were written in a somewhat sensa-
tional manner, though not perhaps objectionable as news
intended for the general public. They were not con-
fined to verbatim reports of the testimony of the wit-
nesses, but to a large extent consisted of condensed ac-
counts of what was testified to by the witnesses, and
statements of the facts involved, some of them not shown
by any evidence in the case. However fair these ac-
counts may have been, and for the most part they were
unobjectionable as a current report of the proceedings,
they were communications with reference to the case
which the jurors should not have received. The only
discussions of the evidence which the jurors should have
an opportunity to consider, before they are secluded for

deliberation on their verdict, are discussions in open court by the attorneys of each party in the presence of those for the other, in which errors of statement may be corrected and improper inferences may be controverted. The jurors should not subject themselves to the danger of misconception and error which must exist if outside persons without the checks incident to an orderly trial and discussion in court are allowed to sum up the evidence, emphasize its particular features, and suggest the conclusions to be drawn therefrom.''

It will be observed that the language employed in the first quoted newspaper article is not a verbatim report of the evidence of any witness, but is a statement in narrative form of the reporter's understanding of it. It will be observed, too, that it communicates to the jury the paper's estimate of its sufficiency for the article in the Times-Record contains the statement that the evidence if not broken down would send the appellant to the electric chair, and also states the opinion that the evidence of Ellis Capps, a son of appellant, did not materially differ from that given by his sister, although the defense contended that neither the boy nor the girl should be believed because of inconsistencies in their statements and contradiction contained therein. The article in the Southwest American is open to substantially the same objections, and calls especial attention to a circumstance in proof which was regarded by the State as highly significant, and that is that the can, which had contained the oil, supposed to have been used in saturating the bed upon which the children had been sleeping, had not exploded, and that, therefore, the oil had been poured out of the can before the fire occurred. The article in the American also advised the jury that the public was startled by the sensational character of the evidence and that the appearance of the boy bore mute evidence of his horrible experience and the consequent truthfulness of his story. It also stated that the evidence of the daughter was given without emotion, except towards the closing part she became haughty and snappy, while the theory

of the defense was that the girl entertained great animosity towards her father and had made many conflicting statements. The American's article also contained the statement that counsel for the defense had been unsuccessful in their attempt to shake the story of the children, but that they had remained firm in them, the inference necessarily being that they were therefore true.

We believe these articles were prejudicial because they were not a mere narration of the evidence connected with the trial which had occurred within the view of the jury and that their necessary effect was to convey to the jury the information that public sentiment had crystallized into the conviction that appellant was guilty of the horrible crime of which he was charged; that his children had stood the ordeal of a searching cross examination and yet remained firm because, as intimated by the papers, their story was true. These were improper influences, and we can not know what effect they may have had upon the minds of the jury, and no attempt was made to show that the jury was not influenced thereby, and we, therefore, reverse this judgment and remand the cause for a new trial.

McCULLOCH, C. J., (dissenting). The testimony in this case is not as strong as is desirable in order to warrant a conviction for a capital crime, but it is undoubtedly sufficient, from a legal standpoint, to justify this court in upholding the verdict of the jury. There are some unsatisfactory features in the evidence, but the jury had the witnesses before them, particularly the testimony of the children of the accused, and a case was made out sufficient to uphold the verdict.

I can not agree to a reversal of the case upon the grounds stated by the court, for I have an abiding conviction that the record is free from any prejudicial error.

It is a sound doctrine, and one supported by authority, that, where the jury in a capital case is kept together, the fact that they read newspaper articles of an inflammatory nature is sufficient to raise a presumption

of prejudicial effect and that the burden rests upon the State to remove that presumption. However, we have the newspaper articles before us which are said to have been read by some of the jurors, and, in my judgment, there is nothing in them that is calculated to prejudice appellant's rights in the minds of those jurors. There is nothing of an inflammatory or sensational character in the articles. They only pretend to relate to events of the trial—events which occurred in the presence of the jury—and do not pretend to convey the outside sentiment or the opinion of the editor concerning the weight of the evidence. It is true that one of the articles speaks of the two children giving testimony which if not broken down would send their father to the electric chair, but the tone of the article evinces clearly the intention of the writer merely to relate the substance of the testimony, and not to express an opinion as to its weight. I think we ought to attribute to the jurors a fair degree of intelligence and presume that they are not mere puppets to be influenced by every flying rumor. They are supposed to be fair-minded men, who will be guided by the testimony adduced upon the witness stand and instructions of law given by the court, and not by mere expressions of others.

As before stated, I do not mean to say that a highly inflammatory newspaper article which purports to express public sentiment or which is calculated to convey to the minds of the jury the idea that it represents public sentiment, would not be held to be prejudicial in the absence of a counter showing on the part of the State sufficient to rebut the presumption. These articles are not of that character, however, and it seems to me that they are not sufficient to raise any presumption that the jurors were influenced by them.

Now, as to the form of the verdict: The court has not passed upon that question, but in order to justify my conclusion that the case ought to be affirmed it is proper for me to say something on that subject. It is true the statute, in terms, declares that "the jury shall,

in all cases of murder, on conviction of the accused, find by their verdict whether he be guilty of murder in the first or second degree.'' Kirby's Digest, § 2409. When the verdict in this case is read in the light of the other parts of the record, it is perfectly clear that the jury have complied with the statute and have by their verdict declared the defendant to be guilty of murder in the first degree. The whole record, including the court's charge, may be considered in interpreting the verdict of the jury, and if, from the whole, it can be ascertained to a certainty what the jury meant, then the verdict is sufficient. *Strawn* v. *State,* 14 Ark. 549; *Fagg* v. *State,* 50 Ark. 506; *Blackshare* v. *State,* 94 Ark. 548.

''Whatever conveys the idea to the common understanding will suffice,'' says Mr. Bishop on that subject, ''and all fair intendments will be made to support it.'' 1 Bishop, Criminal Procedure, § 1004, sub. 5; § 1005a.

In *Fagg* v. *State, supra,* Chief Justice COCKRILL, speaking of a verdict for manslaughter which failed to specify the time, said:

''Viewing the verdict in this case in the light of the evidence and the court's charge, the conclusion is reasonable, if not irresistible, that the jury intended a conviction of voluntary manslaughter. The court had charged them specifically upon that offense, and had made no mention of involuntary manslaughter. If they knew there was such a grade of homicide, it is not probable that they understood that the defendant could be convicted of it in this prosecution.''

In the present case the court specifically charged the jury as to the form of the verdict and told them that if they found the defendant guilty of murder in the first degree, the form of their verdict should be, ''We, the jury, find the defendant guilty as charged in the indictment.'' In response to that instruction the jury adopted the precise form laid down by the court. It is very clear, therefore, what the jury meant when we look to the whole record, and the requirement of the statute is fully met.

I think the judgment in this case should be affirmed, and I, therefore, dissent from the conclusion reached by the majority.