JUDITH GRACE PUTRO, Plaintiff and Respondent, v.
EUGÉNE EDDY BAKER and MANNIX ELECTRIC, Inc.,
a Montana Corporation, Defendants and Appellants.

No. 10976.

Submitted November 29, 1965. Decided February 2, 1966.
As amended February 10, 1966.
410 P.2d 717.

140

Small & Cummins, Helena, Smith & Emmons, Great Falls, Michael J. O'Connell, Bozeman, Floyd O. Small (argued) Helena, for appellants.

DeKalb, Mondale & Johnson, Lewistown, Robert L. Johnson (argued), Lewistown, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from an award to plaintiff, Judith Grace Putro, of $75,000 compensation for personal injuries she suffered in an automobile-truck collision, by a ten to two jury verdict in the Cascade County District Court of the Eighth Judicial District.

The plaintiff-respondent was a passenger in an automobile driven by her brother; the truck was owned by defendant, Mannix Electric, Inc., and was driven by its employee, defendant, Eugene Eddy Baker. Prior to the jury being given the case to consider the evidence, defendants asked for a mistrial due to an unnoteworthy and untimely news item appearing in the "Great Falls Tribune" to which the jurors had been exposed. The article contained a reference to a guilty plea by defendant, Eugene Eddy Baker, to a manslaughter charge for two deaths arising out of the same collision (Miss Putro's aunt and uncle, Armilda and Travis Jaynes, the owners of the automobile involved). By pre-trial order, on stipulation of the parties, any reference to the criminal matter had been barred from the civil suit. The presiding judge, the Honorable Paul Hatfield, reserved a ruling on the motion, taking it under advisement pending return of the verdict and of a polling of the

jurors to ascertain what influence, if any, the article played in their deliberations. After satisfying himself that defendants' rights had not been prejudicially affected, Judge Hatfield entered judgment on the verdict, denying defendants' motions both for a mistrial and for a new trial. Due to the fact that it is our decision that the motion for mistrial should have been granted, consequently we will limit our review to that single specification of error in the proceedings below.

The collision, out of which this action arose, occurred on a hill about three miles west of Stanford, Montana, at about 8:50 A.M., on December 19, 1961. The morning was cold, it was snowing lightly, and the hill was snowpacked and slick. No sanding had yet been done at that early morning hour. Plaintiff alleged that defendant, Baker, negligently drove the truck over the center line into the lane of oncoming traffic and that her injuries were proximately caused from his negligence. Defendants pleaded that due to the road conditions, Baker lost control of the truck and could do nothing to avoid the accident. Plaintiff and her brother Kenneth, who was driving, were seriously injured. Their aunt and uncle, Mr. and Mrs. Jaynes, were killed.

A charge of manslaughter for the death of Mrs. Jaynes was filed against defendant, Eugene Eddy Baker, in the Judith Basin County District Court to which he entered a plea of guilty and was given a suspended sentence. As will hereafter appear the matter of this criminal charge and plea had been discussed at a pre-trial conference. During the cross-examination of Mr. Baker in the presentation of the defendants' case, Mr. Johnson asked, "Was your conduct in getting into this collision in any way wrongful?" Mr. Baker replied, "Not that I recall." Mr. Johnson then queried, "Would you say you are entirely innocent?" Mr. Baker answered, "Yes."

After the defendants had closed their case, the court called for rebuttal. Mr. Johnson asked that Mr. Baker be recalled for questioning alleging that his testimony denying any wrong-

ful conduct in the collision and in asserting his innocence came as a "surprise" to the plaintiff and was not as plaintiff "expected it to be." The court sustained defendants' objection to the move. Mr. Johnson then asked that he be allowed to make an offer of proof. The court excused the jury and heard the matter in the open courtroom. The offer of proof was an attempt to introduce as an admission against interest, Bakers' guilty plea to the manslaughter charge. Mr. Johnson justified his action by asserting that Mr. Baker "said he was innocent of any wrongdoing. I didn't expect any lie." The court barred any reference to the criminal matter from the trial and the record in this connection reads:

"The Court: And we were assured at that time [pretrial conference] you were not going to use this. Now, we pretrialed this case all summer, and I told you at least fifteen to twenty times that the purpose of the pre-trial is to get the issues joined. That we do have disclosure, that we do not play games, that the purpose of this trial is to elicit the truth, all of it. And you were aware that this particular thing was very important to your case and you have been, ever since you obtained the case or the guilty plea was entered. Now, you come in here and play games with this Court. I will not allow it, and I can think of about six reasons why you are wrong from a legal standpoint at this time, and just to show you I meant what I said I'm going to not allow you now to use this conviction.

"Mr. Johnson: So I may completely understand the ruling of the Court, Your Honor, I wish to apologize if I misunderstood the import of your earlier remarks, and I do wish to say parenthetically that had defendant Baker said 'yes, I think I was wrong,' we would never bring in a prior inconsistent statement. Now, the offer of proof I make is this: That we offer to prove merely a prior inconsistent statement, not a conviction of a felony. We have no intention at this time or any other time of introducing a record of a conviction of a felony, and

I wish to inquire of the Court whether I can call other witnesses on rebuttal to prove this inconsistent statement.

"The Court: In my mind, Mr. Johnson, it isn't inconsistent. He answered your question, he has a right to do that. You had a duty to prove your case, you do not do that by cross-examination except where it might happen to come in, and I, personally, being a lawyer, as well as a Judge have wondered why you were proceeding this way, and I can only assume, Mr. Johnson, that you were playing games with the Court, and with Mr. Small. Now, this is a very serious matter, and I don't want to jeopardize your client for what you did, and I sometimes lose my temper and I may be doing that here now, and I think I'm going to take a little recess and I think all counsel will come to Chambers, and we will discuss this further there."

Even though the jury were not present to hear this lengthy and torrid discussion of the matter, a reporter from the Great Falls Tribune newspaper was. The following morning, the day on which the case was to be given to the jury, there appeared the following news item in that paper:

"DAMAGE SUIT TESTIMONY COMPLETED

"Members of a District Court jury this morning are scheduled to hear final arguments and receive instructions in a $407,534 damage action.

"Presentation of testimony was completed Thursday afternoon in the trial of the action brought by Judith Putro Wells against Eugene Eddy Baker, driver of a truck which was involved in collision December 19, 1961, with one in which the plaintiff was riding and Mannix Electric Co..

"The plaintiff rested at noon and the defense with testimony by Baker, his employer, Cornelius Mannix, and Dr. Thomas Power, rested in mid-afternoon.

"Then Robert Johnson, Lewistown, one of the attorneys for the plaintiff attempted to recall Baker as a rebuttal witness. The move was resisted by Marvin J. Smith and Floyd Small, defense attorneys.

"Arguments after the jury was excused brought out that Baker had pleaded guilty to manslaughter at Stanford in connection with auto deaths of Mr. and Mrs. Travis Jaynes, aunt and uncle of the plaintiff. The recall of the witness was related to the subject and both Judge Paul G. Hatfield and defense recalled that Johnson said during pre-trial that he would not introduce this into the case. The Court denied the rebuttal attempt.

"On the witness stand, Baker contended that when his car collided with the car driven by Kenneth Putro, brother of the plaintiff, he skidded on the icy highway."

On the day this article appeared and after the court was called into session but before the trial resumed, defendants' counsel moved for a mistrial upon the assumption that the article must have been read by some of the jurors before they appeared in court that morning. The court took the motion under advisement, deciding to hear the verdict of the jury first and then to poll each juror to ascertain how many may have read the article and whether it had influenced their verdict in any way. In conducting the poll it was soon brought to light that all the jurors had been exposed to the article before the verdict was announced because one of them had clipped it from the paper and had carried it in her handbag to the jury room. The record reveals the following history of the article in the jury room:

"The Court: Did you have a newspaper in the jury room?

"Mr. Lazure: This lady had a piece cut out.

"Mrs. Prinzing: In my handbag.

"The Court: The piece out of the paper was in the jury room?

"Mrs. Prinzing: In my handbag, yes, this morning.

"The Court: Well, after you retired to the jury room—

"Mrs. Prinzing: Then afterwards I got it out and we all read it. We talked about it and wondered.

"The Court: All right. Now, the next question to ask you,

just so the record is clear here—when did Mrs. Prinzing present the article out of the Tribune?

"Mrs. Lodge: It was presented before an opinion was reached, but I and some of the others refused to read it before we reached a verdict.

"The Court: I will ask the foreman, Mr. Lazure, did part of the discussion there in reaching your verdict then have to do with the information in the newspaper article about the conviction of the manslaughter?

"Mr. Lazure: No sir, I don't believe so. To my knowledge I don't believe so.

"The Court: All right, we will do it this way: Again, the clerk will call your name."

Each of the jurors were again polled and each answered that the article had no influence on their verdict. The two jurors who voted for the defendants each indicated that she had read the article before coming to court that morning.

To clarify the matter further, the court continued:

"Now, I have to get a little clearer picture here. We will go back to your foreman, here. After you went to the jury room, how long was it after that that Mrs. Prinzing presented this clipping and how did it come about? ,

"Mr. Lazure: Well, I would say it was an hour after we reached a verdict. They can vouch for this—before anybody saw that slip of paper.

"The Court: You say you had reached a verdict?

"Mr. Lazure: That's right. But we hadn't come to no special agreements on something else.

"The Court: You mean the amount of damages?

"Mr. Lazure: That's right.

"The Court: But you had found liability before this was presented, is that right?

"Mr. Lazure: Yes, I think they will account for that.

"The Court: Is that right?

"The Jury: Yes.

"The Court: And you had been discussing the amount of damages for an hour before this was presented?

"Mr. Lazure: That's right.

"The Court: And then—

"Mr. Lazure: I would estimate an hour. I didn't time it.

"The Court: And after that time was it read by the jury or—

"Mr. Lazure: No.

"The Court: What happened?

"Mr. Lazure: She was sitting by me and passed it to me and I read about half of it and I didn't know what it consisted of. Then I passed it to this woman and she didn't read it all.

"The Court: And then what?

"Mr. Lazure: And then I think she got it back.

"The Court: It that right?

"Mrs. Prinzing: I put it back in my purse.

"The Court: And you put it back in and that's all, is that right?

"Mrs. Prinzing: And after we were all through.

"The Court: After you finally reached your verdict in amount and your verdict was finished some of the others looked at it?

"Mrs. Keating: Your honor, I mentioned the point, the fact that there was something in the paper I didn't think we should read. I don't think I stated it that way and everybody just dropped it and she put it back, more or less, and we dropped the subject immediately after reading the first half. I figured it wasn't for us to read."

Apparently this satisfied the court that whatever influence the article may have had, it was not prejudicial. In its order denying the motions both for a mistrial and for a new trial the court further explained its position on the matter:

"The fact that two of the jurors who had read the article voted for the defense is some indication that the article was not 'per se' prejudicial to the defendant. However, assuming for the purposes of this order that the article was prejudicial,

the portion of the verdict establishing liability was found before any misconduct whatsoever on the part of the jury and in this connection there may be a different rule of law applied to pieces in the paper outside the trial than when the pieces are clipped and brought to the jury room, and in this connection it is to be noted that neither side had anything to do with putting this piece in the newspaper and that all three jurors who read the article affirmatively stated that it did not influence them in any way, and two of them voted for the defense."

We are not as satisfied as the trial judge was with the answers of the jury in response to the exposure thay had to this item of inadmissible evidence. The record, we feel, does not unequivocally show that the contents of the article did not prejudicially color the deliberations of the jury. It was established early in our law in State v. Jackson, 9 Mont. 508, 522, 24 P. 213, 216, that "if misconduct be shown tending to injure defendant, prejudice to the defendant is presumed, but not absolutely." The presumption may be rebutted by the use of testimony of the jurors "to show facts which prove that prejudice or injury did not or could not occur." But, "this court, however, has never held, and does not now hold, that, if the contact of the juror with outside, prejudicial influences be clearly demonstrated and uncontroverted, the juror may purge himself by testifying that such influences did not affect his judgment in forming his verdict." That ultimate inquiry is for the court to decide upon the facts of each particular case. We note that in State v. Jackson, supra, "the court * * * had equal opportunity to correct any possible evil influence of the newspapers." The specific problem with which we are faced was expressly cited by that court as a more difficult case. Said the court: "If these newspapers had gotten to the jury after they retired for deliberation * * * the possibility of injury and prejudice would be more apparent."

The guiding principle of our legal system is fairness. We must tenaciously adhere to the ideal that both sides of a

148

lawsuit be guaranteed a fair trial. Sec. 27, Art. III, Montana Constitution. The function of the jury is to decide the facts of the case only on evidence introduced at trial. It has been noted that "There is no practicable method to so analyze the mental operation of the jurors as to determine whether, in point of fact, the verdict would have been the same if the trial had been conducted, as both parties had a right to expect, according to law and upon the evidence in court." McDaniels v. McDaniels, 40 Vt. 363. The trial court should have declared a mistrial in justice to itself as well as to parties, so that a fair trial may result and the verdict when rendered may be entitled to the respect of both parties and the confidence of the court. We cannot be too strict in guarding trials by juries from improper influences. This strictness is necessary to give due confidence to parties in the results of their causes, and to enlighten the public who have recourse to our courts that any improper influence which has the natural tendency to prejudice the verdict is grounds for a mistrial. See Wright v. Eastlick, 125 Cal. 517, 58 P. 87; Hayward v. Richardson Construction Co., 136 Mont. 241, 347 P.2d 475, 77 A.L.R.2d 1144.

It is the duty of the trial judge to critically assess the "Natural tendency" of the references made in a newspaper article. If, on its face, it has an apparent prejudicial effect, and if possible and indeed probable prejudice and bias would be created in the minds of the jurors by reason of the damaging statement it contained, the admissions by the jurors that they had read the article, that it was in their presence in the jury room, and that comments were made about it during their deliberations upon a verdict, creates a situation of such inherent unfairness that a mistrial should be ordered to prevent a possible miscarriage of justice. In such a case, contact of the jurors with outside, prejudicial influences is clearly demonstrated. The importance of an open-minded jury cannot be over-emphasized. " 'Perfect impartiality in the juror is the object of the law. Anything not legitimate, arising out of the trial of the case, which tends to destroy the impartiality of the

juror, should be discountenanced.' " Styles v. State, 129 Ga. 425, 429, 59 S.E. 249, as quoted in Capps v. State, 109 Ark. 193, 201, 159 S.W. 193, 195, 46 L.R.A.,N.S., 741.

We realize that the presiding judge was in the midst of the situation and was familiar with the atmosphere of the trial. We realize, also, that "The day has passed when blank ignorance and stupidity in a juryman were his best qualifications for service" and that modern juries "are able to read contemporary history, and still preserve their mental balance." State v. Jackson, supra. However, we also realize that unexplained prejudicial references to important matters in litigation may have a "natural tendency" to infect the proceedings with an unfairness that can be corrected only by starting anew the legal contest. Restricting the source of the facts to be considered by the jury to the witness stand is important in all cases.

As the events surrounding the delivery of this verdict came to light, it is difficult for us to see, knowing the inquisitiveness of the human mind, how the jury could not but wonder at the circumstances surrounding the criminal matter. They were left entirely in the dark to decide by their own imagination, after having had brought to their attention that the man they were deciding against had been convicted on the charge of manslaughter from deaths arising out of the accident in question.

The important question that the trial judge faced was whether the complaining party was probably prejudiced by the misconduct. It seems to us that the article was bound to have prejudicial effect. Baranko v. Grenz, 127 Mont. 18, 256 P.2d 1074; Bryant v. Marshall, 135 Kan. 348, 10 P.2d 868; Barajas v. Sonders, 193 Kan. 273, 392 P.2d 849, 89 C.J.S. Trial § 457.

As an aside, we would comment that had this offer of proof been in writing and out of the presence of those in the courtroom that this information could not have caused the difficulty we are confronted with here. The safer practice would be to

take such offers out of the presence not only of the jurors but of those in the courtroom.

On the basis of the facts of this case, a mistrial should have been ordered. We reverse the judgment of the district court and remand the cause for a new trial.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, ADAIR and CASTLES concur.