HELEN CLARK, Plaintiff and Appellant, v. ED A. WENGER and LYDIA GOLDBERG, doing business as Alpine Apartments, Defendants and Respondents.
No. 10569.
Submitted May 4, 1966. Decided June 22, 1966.
415 P.2d 723.

Knight & Dahood, Wade J. Dahood (argued), Anaconda, for appellant.

McKeon & Brolin, John L. McKeon (argued), Anaconda, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment for defendants in a negli-

gence case. Plaintiff was a tenant in an apartment owned and operated by defendants. On September 24, 1960, plaintiff allegedly tripped and fell over a dog in a hallway leading to her apartment. The hallway was under the care and custody of the defendants, as was the artificial or electric lighting. But one end window was available for lighting, and that was in an end room rented and controlled by plaintiff. Plaintiff alleged negligence in failing to have the hallway lighted and in a safe condition for tenants.

As to the lighting, defendants usually turned the lights on "when it was getting a little dark." Sunset on September 24 was stipulated as 6:24 p.m. The tripping incident, according to the plaintiff, occurred "around 6:15." But, the day was "gloomy." At any rate, plaintiff testified that the hall was dark, which caused her to "* * * I knew the furniture [a table] was there, so I moved to the right side of the hall to go down the hall." She further said "I could see the light dimly through the windows in the hall."

Then plaintiff testified as to how she fell, that after tripping over the dog she then walked to the other end of the hallway where she notified one of the children of the manager of the apartments. Then she went to her apartment, feeling "shaky and nervous" and called Mr. Wenger, one of defendants to report the incident. That night she was "nervous and upset." The incident occurred on a Saturday. On Monday she called a doctor, but didn't see him until Wednesday.

Plaintiff described her difficulties thus: "Well, I feel like I am just cut in half. I feel that my left side just doesn't belong to me. I have a burning sensation, and whenever I turn, or turn quickly at all, why it takes me a long while to straighten myself out again, and my arm bothers me continually, and I do not have a grasp in my fingers, and I am never sure of anything that I pick up."

She went on at length to describe her eyes, her left one burning and blinking. Also she was described, and the description

not challenged, as walking about the courtroom with her left arm completely tucked in under her rib cage as though frozen.

She consulted three doctors, one of whom Dr. Davidson, she walked out on without receiving treatment. Another, according to plaintiff, wanted her to have "complete, submerged therapy" but she stated she didn't take that because there was none in the area.

Against this background, Dr. Gold, who testified for defendant, testified to his examination of the plaintiff in which he found what he termed "bizarre response." The bizarre response was shown to be what respondents' brief describes as "miserable failure in the many medical tests Dr. Gold gave her in order to try to objectively evaluate her subjective complaints."

Also, without going into detail, plaintiff's testimony was shown to be less than credible in several categories.

At the close of the testimony, plaintiff made a motion for a directed verdict which was denied. Instructions were settled and read to the jury. Final arguments were had and the court announced that the jury should retire to the jury room.

At this point, a juror, Ralph Currie, stated:

"Your honor, I would like to have a word in private with you before we retire to the conference room." And then said, "It is on a matter that I believe will influence my decision."

The court then conferred with the juror in private. Thereafter, counsel were informed that the juror had noticed, "Helen Clark outside the courtroom and apparently not seeing him reached for her purse with her left hand, but that when she saw him she pulled away her left hand and picked up the purse with her right hand."

In disclosing this conference with the juror the presiding judge stated:

"This juror did explain to me that he had seen this incident, and as a result of that he believed that the plaintiff had been false in her testimony on the witness stand and that because

of that he would have great difficulty in deciding her case fairly upon the evidence that was before the Court because he could not believe her testimony."

The Court then instructed the juror that he was not to consider any fact or facts he learned outside the courtroom. The presiding judge called the juror into chambers and explained this to him.

Counsel for the plaintiff then presented this motion:

"We have a motion to present to the Court in the interests of justice for all parties herein, and we believe that we have legal authority to support this motion, and that is that we ask that this case be reopened solely for the purpose of correcting a false impression that now resides within the jury, and we submit to the Court that after three days of trial, that with Mrs. Clark having waited this long for her day in Court, and with the ultimate importance of this case completely before us all, and particularly Mrs. Clark, that true justice and true equity in this case requires that the case be reopened on that one point, and that evidence be submitted upon it, which will not unduly delay the final determination of this case, and we do move."

Objection was made by the defendant. Plaintiff's counsel then stated:

"Your honor, may I point out the analogy between an eye-witness and this particular juror. This particular juror is going to have a completely different position in that jury room, and he is in there in the position of an eye-witness as to whom we had no right to cross examine, and we have no opportunity at this moment to correct the erroneous impression that exists in his mind—he is the same as an eye-witness, and he is going to go into that jury room, and he is going to say something that will convey to the jury, and the danger does exist that he saw something in which they, the other 11, should believe, and we submit to the court that that does not serve the interests of justice, and how simple it would be to bring the jury back for just 5 minutes at the very most and serve the ends of justice here."

The Court denied the motion. Two additional motions were then made:

"Based upon the information that has been presented to the court by one of the jurors, and which has been placed in the record, we move that the plaintiff, as a matter of probability, cannot have a just and fair determination of her cause, and for that reason we move for a mistrial.

"THE COURT: The motion will be denied."

Because of the juror's alleged bias against the plaintiff, the final motion was this:

"We therefore move for mistrial on the ground and for the reason that there is not a proper jury impaneled to try this case and return a verdict."

Although the motions were not granted the Court was concerned and said:

"Well, this very definitely is a very unusual situation that has arisen here, and I doubt that there is very much precedent for it. I am willing at this time to send the jurors out to dinner, and during the time that they are out to dinner, I will allow counsel time to see if they can find any authority for the position that has been taken by them, and if they have they can show it to me before the jury returns from dinner; that's on both sides here."

Finally, the matter was resolved in this manner:

"Counsel's memory at this particular juncture is the same as it was at the time the motion for new trial was presented, because your honor allowed this case to proceed to the jury upon an assurance from counsel for the defendants that if the juror had violated the Court's admonition not to disclose these particular matters in the jury room, and if we presented affidavits to that effect to your honor in support of a motion for new trial, there would be no objection to the motion for new trial, and once that was done, then counsel stated that such an agreement had not been made, and then he objected to motion for new trial."

Counsel for defendants conceded such an assurance had been made in these words contained in the argument to the court to settle the bill of exceptions:

"Mr. Dahood: Your Honor, we were not aware that a record was not being made, and, moreover, your honor did finally settle the matter after assurance from counsel for the respondent that if we secured affidavits from the jurors to the effect that if Ralph Currie violated the order of the Court and did disclose the matter to the jury, that he would not resist the motion for new trial, and—

"Mr. McKeon: And that they were to allege that this was the overpowering thing which led the jury to the verdict of the jury for the defendants, and which they didn't secure that type of an affidavit—that was our statement to him, and he knows that. And, besides, your honor, this isn't even in the motion which he had presented to us—if we are going to rewrite the transcript, this is a unique way to rewrite it."

Before the jury returned with its verdict, the following question was presented to the court in writing by the jury:

"Judge Stewart, in the event the verdict is 'not guilty' for the defendant, could a recommendation be made in favor of the plaintiff to award her $1,500.00? This then would exonerate the defendant from further obligation. Foreman."

Judge Stewart answered the question in part as follows:

"This is not a criminal action, but it is a civil case for damages, and there is no criminal responsibility involved or criminal punishment involved in this case, regardless of the outcome. Now, you have two forms of verdict, one of which must be signed and returned and that is about as far as I can instruct you on this matter * * *."

One of the jurors stated by affidavit, without objection from the defendants, as follows:

"It was agreed by the jury to give Helen Clark enough to cover her expenses but the presiding judge answered our written question by telling us that we had to award the full amount or nothing."

The motion for new trial was based upon these grounds:

1. Irregularity in the proceedings of the jury by which the plaintiff was prevented from having a fair trial;

2. Misconduct of jury relative to receiving evidence not produced in open court;

3. Irregularity in the proceeding of the court in refusing to reopen the case after court was notified by juror of matters observed outside of courtroom which required that the case be reopened to preserve for the plaintiff a fair trial;

4. That the verdict for the defendants is against the law and without evidence to justify such verdict;

5. Errors in law occurring at the trial and excepted to by the plaintiff; and

6. The court erred in denying plaintiff's motion for a directed verdict at the close of the evidence.

Five jurors supported the motion with this affidavit:

"We, the undersigned jurors in the captioned case being first duly sworn depose and say as follows, to-wit:

"That Ralph Currie one of our fellow jurors disclosed to us in the jury room after starting our deliberation, that he had seen the plaintiff, Helen Clark, start to reach for her pocketbook with her left hand and arm outside of the courtroom and he described what he had seen."

The defendants then responded with an affidavit of all the jurors except the juror who told the judge he could not be fair to Mrs. Clark because of what he had observed. This affidavit stated:

"That I arrived at my verdict in the above-entitled matter freely and independently after considering all of the evidence and instruction; that I was not influenced in arriving at my verdict by anything which the juror, Ralph Currie, may have observed as to the plaintiff using her left arm and hand in the courtroom corridor."

With the consent of the court, and without objection, the

following affidavit was then submitted from one of the jurors who voted for the defendants. The verdict was 9 to 3.

"That I was one of the jurors in the above-named case and I have heretofore signed an affidavit to the effect that Ralph Currie disclosed to us in the jury room certain facts which he observed outside the courtroom.

"After this disclosure by Ralph Currie we discussed the statements which he made to us and several of us then conducted an experiment to determine what the involuntary or ordinary reflex would be of an individual seeking to take hold of an object."

Originally herein we quoted Dr. Gold as reporting "bizarre response" to medical tests. We think the term "bizarre" describes the jury problem. We sympathize with the district judge in a dilemma. The record reveals, as we have hereinbefore attempted to describe, a plaintiff whose credibility was repeatedly shaken; but whose adroit counsel was able to partially rehabilitate. The judge was faced with what to him might have seemed to be another attempt to rehabilitate by the motion for recall of the witness to explain.

Recently in Putro v. Baker, 147 Mont. 139, 410 P.2d 717, this court discussed what we will term misconduct of a juror in a case where a newspaper article referring to a manslaughter conviction was clipped by a juror and carried in her handbag into the jury room. There the court said:

"The guiding principle of our legal system is fairness. We must tenaciously adhere to the ideal that both sides of a lawsuit be guaranteed a fair trial. Sec. 27, Art. III, Montana Constitution. The function of the jury is to decide the facts of the case only on evidence introduced at trial. It has been noted that 'There is no practicable method to so analyze the mental operation of the jurors as to determine whether, in point of fact, the verdict would have been the same if the trial had been conducted, as both parties had a right to expect, according to law and upon the evidence in court.' McDaniels v. McDaniels,

40 Vt. 363. The trial court should have declared a mistrial in justice to itself as well as to parties, so that a fair trial may result and the verdict when rendered may be entitled to the respect of both parties and the confidence of the court. We cannot be too strict in guarding trials by juries from improper influences. This strictness is necessary to give due confidence to parties in the results of their causes, and to enlighten the public who have recourse to our courts that any improper influence which has the natural tendency to prejudice the verdict is grounds for a mistrial. See Wright v. Eastlick, 125 Cal. 517, 58 P. 87; Hayward v. Richardson Construction Co., 136 Mont. 241, 347 P.2d 475, 77 A.L.R.2d 1144.

"It is the duty of the trial judge to critically assess the 'natural tendency' of the references made in a newspaper article. If, on its face, it has an apparent prejudicial effect, and if possible and indeed probable prejudice and bias could be created in the minds of the jurors by reason of the damaging statement it contained, the admissions by the jurors that they had read the article, that it was in their presence in the jury room, and that comments were made about it during their deliberations upon a verdict, creates a situation of such inherent unfairness that a mistrial should be ordered to prevent a possible miscarriage of justice. In such a case, contact of the jurors with outside, prejudicial influences is clearly demonstrated. The importance of an open-minded jury cannot be over emphasized. ' "Perfect impartiality in the juror is the object of the law. Anything not legitimate arising out of the trial of the case which tends to destroy the impartiality of the juror, should be discountenanced." ' Styles v. State, 129 Ga. 425, 429, 59 S.E. 249, as quoted in Capps v. State, 109 Ark. 193, 201, 159 S.W. 193, 46 L.R.A.,N.S., 741.

"We realize that the presiding judge was in the midst of the situation and was familiar with the atmosphere of the trial. We realize, also, that 'The day has passed when blank ignorance and stupidity in a juryman were his best qualifications for

service' and that modern juries 'are able to read contemporary history, and still preserve their mental balance.' State v. Jackson, 9 Mont. 508, 24 P. 213, supra. However, we also realize that unexplained prejudicial references to important matters in litigation may have a 'natural tendency' to infect the proceedings with an unfairness that can be corrected only by starting anew the legal contest. Restricting the source of the fact to be considered by the jury to the witness stand is important in all cases."

Previously we have termed the carrying of a newspaper clipping into a jury room as misconduct of a juror for want of a better term. Certainly, even that term loosely used cannot describe juror Currie's candid revelation to the judge of what he saw and how it affected him. Now then, the juror's power of observation cannot be restricted; and cannot be termed misconduct.

With this preface we turn to Specification of Error 1 which is stated by appellant as follows:

"When a juror discloses in open court that he cannot be a fair juror and then discloses he has received evidence outside the court which renders him a 'witness' against the plaintiff, it is error for the trial court to refuse and reject all suggestions and motions to remedy the situation which deprived the plaintiff of a fair trial."

■ We choose now to narrow our inquiry to the trial court's refusal to allow the motion to recall the plaintiff. This motion was made by plaintiff when the situation became apparent. While we have heretofore observed that the judge might have thought this to be another attempt at rehabilitation of the witness, yet we may or should not speculate on this.

As said in Putro v. Baker, supra, "The important question that the trial judge faced was whether the complaining party was probably prejudiced by the misconduct." Here the trial judge had the opportunity, on motion of the plaintiff, the complaining party, to further inquiry. We believe our recital

of the situation answers our problem, and indicates the confusion of the parties and the court. That such confusion permeated the jury room seems clear, as revealed by the jury's request for further instructions. The trial court was in error in refusing to allow the recall of the plaintiff to be enlightened perhaps on the incident which apparently so influenced the juror. Accordingly, a new trial is granted.

█ Specification of Error 2 is that a directed verdict for plaintiff should have been granted as to liability. Appellant states that there was no conflict in evidence on this. Our recitation of the facts indicates the contrary without more discussion. As to the other specifications we do not comment since in the context of a new trial, the situation may not arise. Any discussion would be academic.

By what is heretofore said, the judgment is reversed and a new trial ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.